Appellant-defendant was tried on an indictment charging him with committing an assault with a deadly instrument to-wit, a rifle, upon Deputy Sheriff Bill Shaw while engaged in the active discharge of his lawful duty or duties. Defendant had pleaded not guilty and not guilty by reason of insanity. A jury found him guilty as charged in the indictment, and the court fixed his punishment at imprisonment for twelve years and sentenced him accordingly.
The cardinal issue presented by appellant is as to the sufficiency of the evidence to support the verdict, which was raised in the trial court by written request for the general charge in favor of defendant, which the trial court refused, and by a motion for a new trial that the trial court overruled.
The issue as to the sufficiency of the evidence is divided into two parts. One is whether there should have been a verdict, under the direction or instruction of the court, of not guilty, and the other as to whether there should have been a verdict, under the direction or instruction of the court, of not guilty by reason of insanity.
There is no merit, in our opinion, in the first phase of the issue presented by appellant. According to the undisputed evidence, on the morning of December 31, 1978, defendant came to the apartment of Randy Cooper, located behind the Townline Motel Restaurant in Andalusia, Alabama, and told Mr. Cooper that "the sheriff or the law was after him. And, I [Mr. Cooper] had better not let them have him." About that time, approximately 6:30, there was a knock at the apartment door, and Mr. Cooper answered the knock and saw Deputy Sheriff Bill Shaw at the door, who asked if the defendant was there. The answer of Mr. Cooper was that "he was not there." Officer Shaw then left the apartment. Mr. Cooper then left his apartment to make a phone call and upon his return defendant had left. Missing from the apartment at that time was a .22 250 Remington rifle, owned by Mr. Cooper. The rifle was loaded "with five rounds." While in the apartment defendant drank five or six glasses of wine, from a bottle of wine he had with him. He stated while there that he was attempting to sell wine to the restaurant.
About 11:30 on the same morning, according to the testimony of A.A. Joseph, who lived in an apartment at the Townline Motel, he saw defendant in front of the motel; at that time defendant had a rifle in his hand with a scope on it, which was established by the evidence to have been the rifle that had been removed from Mr. Cooper's apartment. Defendant was in the "grass area by the road" at the intersection of Highway 29 and another road in front of the motel. Defendant "would stop so often and point it [the rifle] down the road and look through the scope, aim it down the road." A "police car" was "down the road" at the time. Soon thereafter Mr. Joseph heard some shots fired; then defendant came in the restaurant with the rifle and told Mr. Joseph "to get out of it," which he did. Defendant told Mr. Joseph that if he let anyone into the restaurant, he would blow Mr. Joseph's "head off."
Mr. Earl Windham, manager of the Townline Motel, testified that between 11:00 A.M. and 12:00 Noon on December 31, 1978, while he was in his office, he saw defendant out on an island of the by-pass at the intersection of Highway 29 in front of the motel, with a rifle in his hand. He heard a shot and looked again at defendant and saw him shoot the rifle three times. It looked "like he was shooting right down the highway." A truck drove up in front of the office, and people started getting out and running. Mr. Windham managed to get most of his customers back into their rooms in the motel. He heard sirens blowing. He saw defendant get in Mr. Windham's truck, place his hands on the dash and find the key; defendant then drove off in the truck and went south on Highway 29. Defendant had not been registered at the motel on that occasion. *Page 239 
Deputy Sheriff Bill Shaw testified that on the morning of December 31, 1978, he went to the Townline Motel with a warrant for the arrest of defendant. He went to Mr. Cooper's apartment and was informed by Mr. Cooper that defendant was not there. Deputy Shaw then returned to the jail. At approximately 11:30 A.M. he received a telephone call and returned in a "marked patrol unit" of the Covington County Sheriff's Department. Soon after driving through the intersection, a bullet came through the door of the automobile he was driving. He further testified:
"Q. Where did it go after it came through the door?
 "A. It came through right above the arm rest and struck me there (indicating), in the leg or a fragment did.
"Q. Anyway, something came through the door?
"A. Yes.
 "Q. At that time, whereabouts on here were you, or your car, now? (indicating diagram)
 "A. Just at the intersection there, you show a loop, I was in between, right in that area there.
"Q. Somewhere in this area here?
(Mr. McGill indicating on the diagram).
"A. Right.
 "Q. When this hit the car, what did you do, at that time?
 "A. I tried to push the accelerator through the floorboard.
"Q. Which direction did you go?
"A. Back down the by-pass, back toward Rose's.
". . . .
 "Q. All right. After you turned around and got out of the car, could you see Bobby Sasser?
"A. I could.
"Q. Where was he?
"A. In the middle of the highway.
"Q. Was he walking, running, or what was he doing?
 "A. Well, he was moving around, like shuffling, like with his feet.
"Q. All right. And, at that time, what did you do?
 "A. Reached around and turned on the public address system on my radio and tried to talk to him.
"Q. Did you talk to him?
"A. I considered myself talking to him.
"Q. What did you say?
 "A. I said, Bobby, this is Bill Shaw. You know me. Put your gun down.
 "Q. All right. What did he do, when you told him that?
"A. I didn't get any response.
". . . .
"Q. When did you next see him?
 "A. Let's see . . . When the truck was coming out from behind the motel.
 "Q. When the truck came out from behind the motel, what did you do?
 "A. I hollered at Trooper Fowler, motioned for him. He was below me and I motioned for him to come up this way."
Deputy Shaw further testified that they proceeded to follow defendant in the truck, fired at him and caught up with him after defendant had wrecked the truck in which he was traveling.
As to the phase of the issue presented by appellant pertaining to the question whether there should have been a verdict, on direction or instruction of the court, that defendant was not guilty by reason of insanity, we find that there is no substantial dispute in the evidence. Defendant's evidence on the question consisted of the testimony of Dr. Virupaksha Kothandapani, a staff psychologist at Searcy Hospital, Mount Vernon, Alabama, since 1976, who first observed and tested defendant at Searcy Hospital upon his admission there on October 26, 1976. He was admitted on a "probate commitment." He testified to extensive tests and treatment of defendant at that time and on the three other occasions of three other admissions to the Searcy Hospital, including the admission soon after he was arrested for the alleged crime in the instant case. He diagnosed appellant's illness as manic-depressive psychosis, manic type. During his lengthy testimony, he said, inter alia: *Page 240 
 "Psychosis is essentially characterized by loss of contact with reality, and the person is not able to think critically when he is going through psychosis. And, he is not able to act adaptively and the loss of controls are there to prevent [present] problems about his functioning. In other words, he does not function effectively. The main element of psychosis is loss of touch with reality.
 "Q. Does that include the ability to distinguish between right and wrong?
 "A. The person suffering from psychosis will not be able to distinguish right from wrong.
". . . .
 "He is acting simply on the basis of his impulse, and he is likely to go and do things to suit his own thinking which could be delusional. The delusion can take the form of grandiosity, a feeling that he is somebody like Napoleon or that he is a general or something like that.
". . . .
 "That is what happens in the manic phase. The person suffering from mania or manic phase is likely to make judgments so irrational and unrealistic that a common man would be able to see that as crazy.
". . . .
 "Q. Now, Mr. Cook asked you during his cross-examination of it was possible that Bobby Sasser could have been acting violent on December thirty-first of last year, not because of his psychosis but because of other factors. Doctor, do you have a professional judgment as to whether it is probable that he was acting violent due to other factors, other than psychosis?
 "A. I have given some considerable thought to this, and my opinion is that he was manic during that episode, alleged episode.
 "Q. Is this sort of violence consistent with an ex-marine acting out his combat experience?
 "A. It fits very well with the psychological picture."
Dr. William H. Rudder, a psychiatrist engaged in private practice in Mobile and practicing two days a week at the Searcy State Hospital, said that his diagnosis of defendant was "manic depressive illness, manic type." That diagnosis never changed. A part of his testimony was as follows:
 "Q. Doctor, do you have an opinion, based on your knowledge of this case, as to whether on December thirty-first, 1978, Bobby Sasser was insane?
"A. I have an opinion, yes.
"Q. All right. What is your opinion?
"A. It is my opinion that he was insane at that time.
". . . .
 "Q. All right. Now, during the period of December thirty-first of 1978, until January the fifth 1979, in your opinion, could Mr. Sasser distinguish between right and wrong?
"A. You want an opinion?
"Q. Yes.
 "A. I do not think he could distinguish between right and wrong.
"Q. On none of those days?
 "A. Well, you asked me, you know, if we are going to have a hypothetical question we are going to have to apply it all the way across.
"Q. Okay.
 "A. I couldn't tell you that I think he could, because I don't.
 "Q. All right. That is your opinion. None of those times that he could distinguish between right and wrong?
 "A. I couldn't say that there is not a single moment, that all of that time that he wouldn't know the difference between right and wrong, but if the Court would let me, I would like to say that . . .
". . . .
 "Q. In his mind, do you think that Bobby Sasser knew that this rifle would kill a man, if he shot the man with it and hit him in a vital spot?
 "A. I think that he would probably know that fact, but he probably wouldn't be able to correlate it and abstractly relate *Page 241 
it to a human being, being dead or hurt.
". . . .
 "Q. Now, on December the thirty-first, 1978, you testified, I believe, on cross-examination that it is possible that this act, this act of shooting off the gun like that could be the conduct of violence of just a violent nature. Is it probable that it was that rather than a manifestation of the manic phase, manic depressive psychosis?
 "A. Well, I have known this man now for three years. I think, it was highly probable that it was his illness."
The evidence shows that while defendant was under treatment at Searcy Hospital his medication included Lithium, which at times would cause an improvement in his condition, such an improvement that he could be released from the hospital in custody, on one occasion, of his father and on another occasion of legal authorities.
In addition to the testimony of Dr. Kothandapani and Dr. William H. Rudder, on the question of defendant's mental condition, there are more than eight hundred transcript pages, some of them typed on both sides, constituting the hospital record of defendant at Searcy Hospital. Much of it is repetitive. Our attention has been called to none that is inconsistent with constant diagnosis of manic-depressive psychosis, manic type. The record shows that to some extent this condition could be controlled and caused to improve by Lithium and other drugs, but the conclusion seems inescapable that during such times as defendant was not being properly medicated by the specific medicine prescribed, his condition would revert to manic-depressive psychosis, manic type, rendering defendant insane, suffering from a mental disease that would render him incapable of discernment between right and wrong.
The beneficent effect of medication administered by physicians and nurses at Searcy Hospital is vivified by the fact that the trial court had determined that defendant should be evaluated as to his mental competence to stand trial on the indictment in the instant case, and other felonies, and had ordered his transfer to Searcy Hospital for that purpose and thereafter he was found to be mentally competent to stand trial. The report of Dr. Noble Harrison, Ph.D., Unit Director, Unit IV, of the Alabama Department of Mental Health, Searcy Hospital, on March 22, 1979, furnishes the most concise narrative of defendant's mental condition and treatment to be found in any part of the record. We quote it for a better ready understanding of defendant's mental condition and treatment:
 "Mr. Robert Sasser is a 31 year old white male from Covington County who was Probate Court Committed to Searcy Hospital on 1-5-79. In addition to his Probate Commitment he has pending Circuit Court charges in Covington County, Alabama. This patient was first admitted to Searcy Hospital on Probate Court commitment from Tuscaloosa County on October 26, 1976. At that time he had reportedly taken his five year old daughter from his ex-wife's home and had planned to travel to New York with her, had attempted suicide and believed that very important figures in his home county were against him. He was determined to embark on a one man mission to correct all of the political corruption in his home county. He was very grandiose, very hyperactive and at that time, was given a psychiatric diagnosis of Manic Depressive Illness, Manic Type. He was discharged in substantial improvement on medication and was released from the hospital on a trial visit status on April 8, 1977 and was instructed to continue to take his medication which was Lithane 600 mg. t.i.d. and to report for regular serium lithium blood levels to help regulate the medication. He was eventually discharged from the hospital on October 8, 1977 after being on trial visit status for six months. His second admission was on January 5, 1978 again on a Probate Court commitment from Covington County, Ala. At that time he reportedly was threatening to harm other people in his community, was destroying property, and had destroyed various fixtures in the county jail where he had been held prior *Page 242 
to being sent to Searcy Hospital. He was seen several times by the consulting psychiatrist during this second hospitalization and was given a diagnosis of Manic Depressive Illness, Manic Type. He was placed on psychotrophic medication and after achieving a good remission on medication was again trial visited to the care of his father on April 3, 1978. He was again instructed to continue to take his medication including Eskalith, 600 mg. t.i.d., Artane, 5 mg. b.i.d. and Navane, 20 mg. q.i.d. It was recommended that he continue follow-up counseling sessions at the mental health center. The present admission followed a rather bizarre series of events, including his reportedly firing a rifle at the Deputy Sheriff and a car chase with the patient trying to evade the police in a pick-up truck and the police following him and Robert's subsequent wrecking of his pick-up truck. This incident followed reports that Robert's behavior had been deteriorating significantly since about Thanksgiving of 1978. He reportedly attempted to break out of jail whenever he was in the Covington County Jail and was brought to this hospital with instructions to supervise him very closely as he was a high elopement risk. On his first admission to the hospital, it was necessary to keep the patient in seclusion for a period of time due to his hyperactivity, grandiosity, and his aggressiveness and hostility on the ward. He was treated quite aggressively with psychotrophic medication including Navane and Lithium Carbonate and has resulted the medication and his management on the ward, his mental condition has quite substantially improved. At the present time, he has achieved a point in remission that the staff at the hospital is seriously considering recommending that he return to court to have his day. He is not considered an elopement risk at the present time, and he is not considered a threat to the safety of himself or others. Due to the fact that his mental condition and behavior has improved remarkably, it would be the recommendations of the staff at Searcy that with the court's permission he might be transferred from the maximum security unit to a section where less restrictive conditions for his treatment might be instituted. I would appreciate any response from the court in regard to this suggestion."
Appellee relies heavily upon Code of Alabama 1975, § 15-16-2:
 "Every person over fourteen years of age charged with crime is presumed to be responsible for his acts, and the burden of proving that he is irresponsible is cast upon the accused. The defense of insanity in all criminal prosecutions shall be clearly proved to the reasonable satisfaction of the jury."
The cited section of the Code is to be found unchanged in each successive Code since 1896. Appellee also relies upon and quotes from Talbert v. State, 140 Ala. 96, 37 So. 78 (1904), in which it is said:
 ". . . That the defendant was `subject to spells of insanity from time to time,' raises no presumption in favor of the defendant that he was insane at the time of the commission of the alleged homicide, to the extent of shifting the burden to the state to prove his sanity. — Porter v. State, 135 Ala. 51, 56, 33 So. 694. . . ."
The instant case is not one which can be accurately described as one of "spells of insanity." It is a case in which, according to the undisputed evidence, defendant was constantly insane except during periods in which his mental illness was controlled or made better by proper medication. The only evidence on the subject is to the effect that at the time of the alleged crime in the instant case he was not under proper medication and he was insane.
It is true, as argued by appellee, that a jury may reject all expert testimony even though it is without conflict. Christianv. State, Ala., 351 So.2d 623 (1977). However, the rule stated in Christian, and some other rules stated therein, yield to an exception. As stated in Herbert v. State, Ala.Cr.App.,357 So.2d 683, 689, cert. denied, 357 So.2d 690 (1978): *Page 243 
 "The one exception to these rules is found in those cases where the proof of insanity is overwhelming and uncontradicted.
 "`Cases of insanity may be so clear, the proof so strong and undisputed, that the jury should be instructed in like form.'
 "Boyle v. State, 229 Ala. 212, 222, 154 So. 575, 583
(1934).
 "A review of the case law in this state reveals that on only two occasions has this exception been invoked by an appellate court and a judgment of conviction reversed because a jury verdict was contrary to the preponderance of the evidence on the issue of insanity. Those cases are Christian, supra; and Pickett v. State, 37 Ala. App. 410, 71 So.2d 102, cert. denied, 260 Ala. 699, 71 So.2d 107 (1954). Boyle, supra, although speaking to this issue, was reversed on other grounds. After careful consideration and long deliberation, we are of the opinion that the overwhelming evidence presented by the appellant has amply overcome the presumption of sanity."
There could well be argument on both sides of any question as to the weight of the testimony of insanity in Herbert as compared with the weight of such testimony in the instant case, but in this case, as well as in Herbert, there is no evidence by which the testimony of two unimpeached and unimpeachable experts, to the effect that defendant was insane at the time of the alleged crime, may be disparaged. The history of the same mental illness and behavior, previous commitments of defendant as insane by reason of the same mental illness, his bizarre behavior that caused all persons concerned to treat defendant on the entire morning of the alleged crime as a crazy man, rather than as a sane criminal, are supportive of the testimony of the experts who took the stand.
We repeat and apply here what was said in Herbert, supra, at357 So.2d 690:
 "The appellant's conviction can only be sustained on the bare presumption of sanity prevailing as to every accused and afforded by statute. That presumption, being a presumption is rebuttable by clear and sufficient evidence reasonably satisfying the jury of the existence of the claimed mental incapacity. However, we consider the undisputed and substantial evidence as to the appellant's mental defectiveness to have overcome this presumption.
 "The verdict and judgment being contrary to the evidence and the legal principles applicable, this cause must be reversed for the failure of the trial judge to give the affirmative charge."
The conclusions hereinabove reached make it unnecessary for us to attempt to resolve other issues presented by appellant.
We are not unmindful of the fact that the result of a judgment of reversal in such a case as this leaves much to be desired in the field of a proper solution of the proliferating special problems pertaining to dangerous persons, who, after being held "not guilty by reason of insanity," are at some time thereafter released from treatment and custody and then rob and rape and kill again. Whatever the province of the judiciary as to such problems, it is definitely not the function of judges, either appellate or trial, in cases hinging upon whether one is guilty of a particular crime or not guilty by reason of insanity, to permit any such problem to sway them from the course that the law has set for them, which they themselves have uniformly declaimed as the course for triers of fact to follow. Speaking to the point nearly a half century ago, the Supreme Court of Alabama said:
 "Clearly the sole question in this connection was whether defendant was `not guilty by reason of insanity.' What might happen if he were sent to the insane asylum, instead of the penitentiary, should not have been thrown into the case to influence the verdict.
 "Maybe the law should provide some greater safeguards, such as a judicial inquiry, before persons found not guilty of murder by reason of insanity should be discharged from the hospital for the insane; but this should not be allowed to influence juries in trials like this. [Let us *Page 244 
now add, `or judges on appeal.']. State v. Johnson, 151 La. 625, 92 So. 139." Boyle v. State, 229 Ala. 212, 225-226, 154 So. 575, 587 (1934).
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court. The judgment below is hereby reversed and the cause remanded.
REVERSED AND REMANDED.
All the Judges concur, except DeCARLO, J., not sitting.