[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 941 
Leroy Ware was convicted of first degree assault in violation of Ala. Code 1975, § 13A-6-20. He was sentenced to 15 years' imprisonment and was ordered to pay court costs, $25 to the Victims' Compensation Fund, and $3,083.55 in restitution. Ware raises three issues on this appeal from his conviction.
 I
The appellant was indicted under Ala. Code 1975, §13A-6-20(a)(1) for intentionally "caus[ing] serious physical injury to [B.P.] by means of a deadly weapon or dangerous instrument." He asserts that his conviction under this section must be reversed because the State failed to show that the victim suffered a "serious physical injury."
The State's evidence established that, on April 20, 1989, the appellant beat B.P., the eight-year-old son of the appellant's live-in girlfriend, with his fists and a belt. The beating occurred while the victim's mother, J.P., was at work. J.P. did not discover that the child was injured until the next morning. J.P. stated that B.P.'s face was swollen "beyond recognition" and that there was a "gash in his head." After attempting to treat B.P.'s injuries, J.P. called "911." B.P. was then taken to the emergency room at East Alabama Medical Center.
The emergency room nurse who attended the victim immediately upon his admission testified that child's face was swollen, "his eyes were nearly swollen shut," "he had several abrasions to his back," and he had "a one to one and a half inch laceration to the back of his head." Dr. John D. Morehouse, an emergency room physician, testified that he examined the victim and determined that the victim
 "had a lot of soft tissue injuries of the face, extremities, neck, had some tenderness of his back. He had a ruptured eardrum on the left, a laceration of the scalp. He had hemorrhage of the right drum, eardrum, and, . . . multiple and scattered bruises and associated injuries."
Dr. Morehouse also testified that he was concerned that the victim might have spinal cord injuries because there were "compression fractures of about four thoracic vertebrae." He stated that "there was a very severe threat that [the victim] could have major spinal cord or brain injury in this case." During the first few minutes of examining the victim, Dr. Morehouse "felt like there were potentially life threatening injuries." Upon the completion of his examination and diagnostic tests, Dr. Morehouse "rule[d] out immediate life threatening [injuries] but not delayed life threatening." Dr. Morehouse stated that the victim was in the emergency room for several hours, then was admitted to the hospital, where he stayed four or five days.
"Serious physical injury" is defined in § 13A-1-2(9) as "[p]hysical injury which creates a substantial risk of death, or which causes serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ." "Substantial risk of death," as used in § 13A-1-2(9) "means more than just any risk of death, but does not mean that death was likely. If there is a 'real hazard or danger of death,' serious [physical] injury is established." State v. Anderson, 308 N.W.2d 42, 47
(Iowa 1981) (construing a statute similar to § 13A-1-2(9)). "[T]he test of 'substantial risk of death' is not whether the victim lives or dies," State v. Fuger, 170 Mont. 442,554 P.2d 1338, 1340 (1976) (construing a statute similar to §13A-1-2(9)), nor does it require that death be certain or expected," State v. Anderson, 308 N.W.2d at 47.
This is not a case where the victim was treated briefly then released from the hospital. Compare Davis v. State,467 So.2d 265, 266 (Ala.Cr.App. 1985); Nelson v. State,462 So.2d 962, 963 (Ala.Cr.App. 1984). The victim's injuries necessitated a four-or *Page 942 
five-day hospital stay, and it is clear from Dr. Morehouse's testimony that there was a risk of death involved. We find that the evidence in this case was sufficient for the jury to conclude that the beating administered by the appellant caused "serious physical injury" to the victim. State v.Anderson, 308 N.W.2d at 47; State v. Fuger,170 Mont. at 444-45, 554 P.2d at 1340. See White v. State, 448 So.2d 421,425 (Ala.Cr.App. 1983).
 II
The appellant alleges that the trial court erred in refusing his written requested charges numbered 3, 4, 5, and 7. However, none of the appellant's written requested charges were made a part of the record on appeal. Consequently, we cannot review the trial court's refusal to give certain of those charges. See Hollis v. State, 51 Ala. App. 181, 183,283 So.2d 632, 634 (1973). Cf. Copeland v. State, 455 So.2d 951,955 (Ala.Cr.App.), cert. denied, 455 So.2d 956 (Ala. 1984) (this court could not review trial judge's ruling on sufficiency of affidavit and search warrant where those items were not included in the record on appeal).
 III
The appellant contends that his plea of not guilty by reason of severe mental disease or defect was established by overwhelming and uncontradicted evidence. Consequently, he asserts, the jury's verdict was contrary to the weight of the evidence and was wrong and unjust.
In 1988, the Alabama legislature replaced our insanity defense statute by enacting the "Reasonable Insanity Test Act of 1988," 1988 Ala. Acts 1051, No. 88-654, now codified at Ala. Code § 13A-3-1 (Supp. 1990). Subsection (a) of that statute provides that:
 "It is an affirmative defense to a prosecution for any crime that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or wrongfulness of his acts. Mental disease or defect does not otherwise constitute a defense."
Section 13A-3-1(a) is virtually identical to the federal insanity defense statute, 18 U.S.C. § 17(a) (1988), which "was passed in the wake of John Hinckley's acquittal of charges arising from his actions in shooting President Ronald Reagan and Press Secretary James Brady." United States v. Cameron,907 F.2d 1051, 1061 (11th Cir. 1990).
The new Alabama and federal insanity statutes represent a significant change from the insanity defenses previously available in criminal trials. Formerly, a defendant was not responsible for his criminal acts if "at the time of such conduct as a result of mental disease or defect he lack[ed] substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." Ala. Code § 13A-3-1(a) (1982 Replacement Vol.); UnitedStates v. Freeman, 357 F.2d 606, 622 (2d Cir. 1966). It is clear that the new § 13A-3-1(a) is "substantially more restrictive" than its predecessor section. United States v. Brown,899 F.2d 189, 192 (2d Cir. 1990) (comparing 18 U.S.C. § 17(a) to the predecessor defense recognized in federal courts). Where the original § 13A-3-1(a) had both a "cognitive" test (lack of capacity to appreciate the criminality of the conduct) and a "volitional" test (lack of capacity to conform one's conduct to the requirements of the law), the new § 13A-3-1(a) has only a "cognitive" test (inability to appreciate the nature and quality or wrongfulness of one's acts). See United States v.Brown, 899 F.2d at 192; United States v. Cameron, 907 F.2d at 1061.
While the new § 13A-3-1(a) contains only the "cognitive" test, the defendant must make a two-part showing to meet this test. "First, he must establish that he suffered from a serious mental disease or defect at the time of the crime. Second, his mental disease or defect must have prevented him from appreciating the nature and quality or wrongfulness of his acts." United States v. Knott, 894 F.2d 1119, 1121 (9th Cir.), cert. denied, ___ U.S. ___, 111 S.Ct. 197, 112 L.Ed.2d 158
(1990) *Page 943 
(citations omitted) (emphasis added). The defendant must prove both prongs of this test "by clear and convincing evidence." § 13A-3-1(c) (Supp. 1990).
While new § 13A-3-1(a) contains a much more restrictive definition of insanity than that under which we previously operated, the general principles of law regarding the defense of insanity remain unchanged. Those principles have been summarized as follows:
 "1. By statute, there is a presumption of sanity extending to all persons over the age of 14.
 "2. The defense of insanity is an affirmative defense. The burden of proving this defense rests upon the defendant and never shifts to the state.
 "3. The burden upon the defendant is to establish the issue of legal insanity by a preponderance of the evidence and to the reasonable satisfaction of the jury.
 "4. The question of insanity at the time of the commission of the crime is a matter to be determined by the jury from a consideration of all the evidence.
 "5. In making its determination, the jury may reject all expert testimony though it is without conflict.
 "6. However, opinion testimony, even of experts, must be weighed by the jury and may not be arbitrarily ignored.
". . . .
"The one exception to these rules is found in those cases where the proof of insanity is overwhelming and uncontradicted.
 " 'Cases of insanity may be so clear, the proof so strong and undisputed, that the jury should be instructed in like form.' Boyle v. State, 229 Ala. 212, 222, 154 So. 575, 583 (1934)."
Herbert v. State, 357 So.2d 683, 688-89 (Ala.Cr.App.), cert. denied, 357 So.2d 690 (Ala. 1978). See also Christian v. State,351 So.2d 623, 624-25 (Ala. 1977); Ellis v. State,570 So.2d 744, 749-753 (Ala.Cr.App. 1990).
The evidence offered by the appellant established that he had been involuntarily committed to state mental institutions in 1980, 1983, and 1986. Two of the appellant's sisters testified that the appellant had had "mental problems" for a number of years, although both women made only very general statements regarding these problems.
The appellant also offered expert testimony on this issue. Dr. Chester Jenkins, a psychiatrist in Opelika, testified that he first saw the appellant "in the early 1980s," and that his treatment of the appellant continued until October 1988. During this time, he made a two-fold diagnosis of the appellant: "one, that he has a chronic schizophrenia; the other that from time to time he abuses alcohol." Dr. Jenkins described "chronic schizophrenia" as "one of the major mental illnesses which involves confusion, difficulty concentrating, sometimes difficulty separating what's real from what's not. Sometimes people who have schizophrenia would tend to develop rather severe depressions as a part of the illness."
In October 1988, Dr. Jenkins had prescribed three medications for the appellant: Stelazine, Lithium, and Cogentin. Dr. Jenkins testified as to the reasons for prescribing these medications:
 "The major purpose of the Stelazine is to make a person better able to concentrate and control his own thoughts, to pace, to regulate how fast his thoughts go, to direct his thoughts and be able to think about what he wants to rather than have things just get on his mind and stick and not be able to get them off, or rather than just have his thoughts skip from one thing to another without his control.
 "The second thing that Stelazine does is to help to stabilize a person's mood, to help him to tolerate more stress without his moods starting to shift about on him.
 "The third major effect of it is that it helps to stabilize the person's physical functions, particularly sleep, appetite, energy, and those things.
 "The Lithium was added in an effort to give some further stabilization to his mood changes, to the depressions that I mentioned earlier. *Page 944 
 "The Cogentin is simply to block some muscle tightness, or muscle rigidity, that people sometimes get as a result of the Stelazine. So it has no particular effect as to anything psychiatric."
When asked by defense counsel whether these medications "appear[ed] to control [the appellant's] illness," Dr. Jenkins replied, "Somewhat." On cross-examination, Dr. Jenkins acknowledged that he could tell the jury "nothing" about the appellant on the day of the beating or whether the appellant was taking his medication at that time as the last time he had seen the appellant had been considerably before the beating occurred.
Dr. Rohini Reddy, a psychiatrist with East Alabama Mental Health, testified that she had treated the appellant "[f]rom '86 to the present, off and on." She diagnosed the appellant as "[s]chizophrenic, paranoid type," explaining that "one of the subtypes [of schizophrenia] is paranoid type, with people being suspicious. They don't trust others, they think somebody else is trying to get them." Dr. Reddy's last contact with the appellant prior to the beating was March 8, 1989, when the appellant came in for a routine check-up. At that time, the same medications described by Dr. Jenkins were being prescribed for the appellant.[1] Dr. Reddy testified that these medications were used "so that [the appellant] does not get so suspicious, paranoid, and he can function normally." Further questioning by defense counsel in relation to the appellant's medication was as follows:
 "Q. Okay. If [the appellant] did not take these medications, what would be the effect under your diagnosis?
 "A. He would become very suspicious of others and not trust others.
"Q. Okay. Could that lead to violence?
"A. Possibly.
 "Q. In his history and not taking his medication and staying under psychiatric care, had it lead to violence according to your history?
 "A. "There's no documentation that he was violent at anytime.
". . . .
 "Q. In [the appellant's] case is his problem a minor or major problem?
"A. He has a major psychiatric diagnosis.
"Q. Would you consider that to be severe?
"A. If he doesn't take his medicine."
Melvin Frazier, a social worker in the psychiatry department at East Alabama Medical Center, testified that he had been a friend of the appellant's for 11 years and saw the appellant "[e]very other day." Frazier stated that the appellant was taking his medications in April 1989, "but the night before this happened, he stopped taking it and drank some beer." According to Frazier, "whenever [the appellant] quit taking his medication, his nerves go to bother him and [he] worried about things and get depressed and least little thing upset him [sic]."
On cross-examination, Frazier acknowledged that he could not give a specific date in April 1989 as the last time he actually saw the appellant prior to the beating. Frazier stated that if he had seen the appellant on April 20, 1989, the day of the beating, it would have been "obvious" to him if the appellant had not taken his prescribed medication. He acknowledged that this would also have been "obvious" to anyone who knew the appellant, such as J.P.
In addition to a number of hospital records, the appellant offered the forensic evaluation report prepared by Dr. Kamal A. Nagi of the Taylor Hardin Secure Medical Facility. While this document basically related to the appellant's competency to stand trial, it also contains a section entitled "Forensic Formulation." In that section, Dr. Nagi stated:
 "From the available data, social history, previous hospitalization, and psychiatric treatment, it is my clinical opinion that Mr. Ware has a long history of alcohol abuse and an unspecified mental disorder which responded well to treatment with *Page 945 
chemotherapy and is currently in remission. It is also my clinical opinion that Mr. Ware is currently sane and at the time of the alleged offense he was most probably under the influence of alcohol and was not taking his medication which could have [a]ffected his control over his impulses. The patient was also under stress because of his emotional difficulties related to his girlfriend, and this could have been an additional factor which contributed to his commitment of the alleged offense. There is also the possibility that unconsciously he took the anger and hostility towards his girlfriend out on the child."
The State offered no witnesses in rebuttal, and its only evidence on the issue of insanity was presented during the testimony of J.P., the victim's mother. J.P. and her two children had, prior to this incident, lived with the appellant off and on for approximately two years. J.P. testified that she knew the appellant had been diagnosed as "having mental problems" and that the appellant was receiving psychiatric treatment during that two-year period. On several occasions, J.P. and her children left the appellant's trailer and went to stay with her grandmother because the appellant had become violent. According to J.P., these episodes generally occurred when the appellant quit taking his medication and consumed alcohol.
Although J.P. stated that the appellant was not taking his medication at the time the beating occurred, she acknowledged that she did not know this from personal observation. She testified that there were times when the appellant did not take his medication and did not drink. In response to the prosecutor's question, "Everytime he got to drinking it was the same thing, wasn't it?" J.P. replied, "Yes, when he did get to drinking it was always violence incurred [sic]."
On the day the beating occurred, the appellant, accompanied by J.P.'s two children, drove her to work at 4:00 p.m. J.P. testified that the appellant had not been drinking earlier that day. However, when the appellant picked her up at work at 12:30 the next morning, she detected the odor of alcohol about him. When J.P. got in the car, the appellant told her that he had "whipped" B.P. because the child lied to him. Upon their arrival at the trailer, the appellant would not permit her to check on her sons. The appellant was "emotional" and talked all night long. At some point during the night, the appellant stated that B.P. might have to stay home from school the next day because "I may have hit him too hard and his face may be swollen."
Through J.P., the State introduced a letter written by the appellant while awaiting trial on the instant charge. This letter contained the statements, "I'm the one being punish for that stopid. I should [not] have drunk those five beers when I don't soposed not to drink in the first place [sic]."
"In order for this court to reverse [a guilty verdict on the ground that it is contrary to the weight of the evidence of insanity, the] evidence of insanity must be 'overwhelming,' 'uncontradicted,' and clear, . . . strong and undisputed.' " Sistrunk v. State, 455 So.2d 287, 289
(Ala.Cr.App. 1984) (citations omitted). As noted above, this evidence must establish that, at the time the offense wascommitted, (1) the defendant was suffering from a severe mental disease or defect and (2) that this disease or defect resulted in the defendant's inability to appreciate the nature and quality or wrongfulness of his actions. § 13A-3-1(a) (Supp. 1990).
In this case, the appellant clearly established that he had a mental disease or defect at the time he assaulted B.P. SeeUnited States v. Knott, 894 F.2d at 1121 ("[t]he parties agree that [the defendant's] schizophrenia is a serious mental disease that satisfies the first prong of the test"). However, we cannot say that there was "overwhelming," "uncontradicted," and "clear [and] strong" evidence that this disease or defectrendered him unable to appreciate the nature and quality orwrongfulness of his acts. None of the appellant's experts specifically testified that the appellant's mental illness would *Page 946 
result in such an inability. Compare, e.g., Ex parte Turner,455 So.2d 910, 912 (Ala. 1984) (psychiatrist testified that defendant was "suffering from 'schizophrenia, paranoid type' " and that, in his opinion, at the time of the murder, the defendant "was acting under a delusion" and "was mentally incapable of forming an opinion as to whether his actions were right or wrong"); Sasser v. State, 387 So.2d 237, 239-40
(Ala.Cr.App.), cert. denied, 387 So.2d 244 (Ala. 1980), cert. denied, 450 U.S. 924, 101 S.Ct. 1376, 67 L.Ed.2d 353 (1981) (psychologist, who had diagnosed defendant's condition as "manic depressive psychosis, manic type" some two years prior to the commission of the crime, testified that a "person suffering from psychosis will not be able to distinguish right from wrong" and that, in his opinion, the defendant "was manic during th[e] episode in question"). In fact, the testimony of the psychiatrists as well as Dr. Nagi's report could be interpreted that the appellant had a control or "volitional" problem rather than a "cognitive" problem. As noted above, "volitional" problems or the inability to conform one's conduct to the requirements of the law has been excluded from the new insanity defense statute.
Like the defendant in Sasser v. State, the appellant's condition cannot "be accurately described as one of 'spells of insanity.' " 387 So.2d at 242. However, this case is readily distinguishable from Sasser. In Sasser, the psychologist's testimony was such that this Court was faced with the "inescapable" conclusion that, while the defendant's "condition could[, to some extent,] be controlled and caused to improve with [medication]," when the "defendant was not being properly medicated . . . his condition would revert to manic depressive psychosis, manic type, . . . a mental disease that would renderhim incapable of discerning right from wrong." 387 So.2d at 241. A review of the psychiatrists' testimony in the present case does not require us to reach that conclusion.
This was not a case where the jury was required to reject the opinions of expert witnesses. Compare Ellis v. State,570 So.2d 744 (Ala.Cr.App. 1990). In this case, the testimony of the experts was subject to interpretation, and it was clearly within the province of the jury to make this interpretation.
Further, there was abundant evidence that this crime was committed while the appellant was voluntarily intoxicated. Voluntary intoxication "is not a defense to a criminal charge,"[2] § 13A-3-2(a), nor does intoxication in and of itself "constitute mental disease or defect within the meaning of section 13A-3-1," § 13A-3-2(d). Intoxication may be used as a defense only if it rises to the level of statutory insanity. See Allen v. State, 539 So.2d 1124, 1126 (Ala.Cr.App. 1988);Lister v. State, 437 So.2d 622, 624 (Ala.Cr.App. 1983). Here, there was no evidence that the appellant's alcoholism had resulted in a "severe mental disease or defect." Further, just as there was no "overwhelming," "uncontradicted," and "clear [and] strong" evidence that the appellant's schizophrenia rendered him unable to appreciate the criminality of his conduct, there was no such evidence that the appellant's voluntary intoxication rendered that result.[3]
Moreover, there was evidence in the record from which the jury could have concluded that the appellant did not fall within the statutory definition of insanity at the time of the offense, i.e., that the appellant was able to appreciate the wrongfulness of his acts. The victim testified that the beating took place the night of April 20, 1989, right before he was to go to bed. Later *Page 947 
that same night, the appellant told J.P. that he had had to "whip" B.P. for lying to him and that he might have hit B.P. "too hard." The appellant also refused to allow J.P. to check on B.P. before she retired for the night. " '[C]onsciousness of the moral or legal criminality of the act, with connectedness in the employment of the reasoning faculty, while not conclusive evidence of sufficient sanity to justify criminal punishment, are nevertheless strong circumstances tending to prove legal accountability.' " Cunningham v. State,426 So.2d 484, 491 (Ala.Cr.App. 1982) (quoting Boswell v. State,63 Ala. 307, 320 (1879)). This Court will not disturb a guilty verdict "if the record reveals any facts from which the jury could have inferred that the defendant was sane at the time of the crime." Sistrunk, 455 So.2d at 289.
For the reasons stated above, the judgment of the circuit court is affirmed.
AFFIRMED.
All Judges concur.
[1] An additional medication, Synetry, which, like Cogentin, was to be taken to combat the side effects of the other medications, was also being prescribed.
[2] Although proof of voluntary intoxication may be offered to "negate an element of the offense charged," § 13A-3-2(a), the appellant did not argue below and does not argue here that his voluntary intoxication negated the intent element of §13A-6-20(a).
[3] There has been no contention in this case that the appellant's schizophrenia combined with his voluntary intoxication rendered him unable to appreciate the wrongfulness of his actions. We note that this position was rejected in United States v. Knott, 894 F.2d at 1121-23, on the basis that it "would broaden the [insanity] defense," contrary to Congress's "clear intent to narrow the common law definition of insanity."