The appellant, Johnny M. Hale, was charged with assault in the first degree and with two instances of reckless endangerment. A jury convicted him of all three charges and he was sentenced to imprisonment for fifteen years on the assault conviction and to imprisonment for one year on each of the reckless endangerment convictions. He was also ordered to pay $1,000 to the Crime Victims' Compensation Fund and to pay restitution in the amount of $6,036.28. Three issues are raised in this direct appeal from the convictions.
The conduct giving rise to the charges against the appellant occurred on October 18, *Page 84 
1992. The evidence adduced by the State tended to show that on that date the appellant owned or operated the Tallaseehatchee Farms in Calhoun County. The appellant and his wife lived in a house on the farm. Roscoe Douthit, the victim of the assault, was the appellant's business partner in renting horses for trail rides. Douthit and Gail Smitherman rented from the appellant an apartment over the barn in which the horses available for rent were stabled. Douthit also operated a business at that location in which he bought and sold horses.
Several prosecution witnesses testified that around 9:00 a.m. on October 18, the appellant had an altercation with J.R. Lawley, an employee of Douthit's, in or near the riding pen in front of the barn. When the appellant slapped Lawley, Douthit intervened, stating that customers would be arriving and that if the two were going to fight, they should do so behind the barn. The appellant left the barn area and walked to his house, stating that he "would show" those present and that he would "run [them] all off." R. 26. Approximately eight people were in the barn area when the appellant made these threats.
A short time later, the appellant emerged from his house carrying a rifle. After exchanging words with Douthit, the appellant either pointed or waved his rifle in Douthit's direction. Douthit, who stated that he carried a .45 caliber pistol, drew his own weapon and pointed it at the appellant. The appellant's wife then talked the appellant into returning to the house.
A family of four arrived at the farm and began a trail ride, accompanied by Lawley. After these customers had left the barn area for their ride, the appellant's brother arrived, driving his pick-up truck at a high rate of speed. He parked near the appellant's house and went inside. Shortly thereafter, he and the appellant came out of the house. The appellant was armed with a rifle and his brother was armed with a shotgun. One or both men began firing at the barn area, where Douthit and four or five other people were located.
Douthit took cover behind a vehicle parked in the barn area, and the others present either ran into the barn or behind the barn. Douthit stated that he fired twice towards the appellant and his brother. One shot hit the appellant's vehicle, which was parked at the corner of the appellant's house, and the other struck the appellant's brother. Douthit sustained a gunshot to his foot and another to his shoulder. The shooting stopped shortly after Douthit was shot in the shoulder. Two women arrived at the farm at that time and Douthit was transported to the hospital in their vehicle.
Officers who arrived on the scene after the shooting confiscated a Ruger mini 14 semi-automatic rifle from the appellant and a Mossberg shotgun belonging to the appellant's brother. At the time the rifle was confiscated, the clip in it "contain[ed] 17 live, .223 caliber [full] metal jacket rounds." R. 131. The officers recovered 16 empty .223 caliber shells from the ground near the appellant's vehicle. They also recovered "five empty .12 gauge shotgun shell casings." R. 133. "[A] slug from a .45" was recovered from the appellant's vehicle, R. 135, and two spent .45 shells were found by the truck where Douthit had taken cover. The officers also photographed bullet holes in the barn walls and doors and in various vehicles and horse trailers parked near the barn.
 I
The appellant's claim that the State failed to prove venue is without merit. Dennis Watts, who was present at the Tallaseehatchee Farms when the shooting occurred and who was the State's first witness, testified that the shooting occurred in Calhoun County. R. 34. This was sufficient to establish venue. See Rothchild v. State, 558 So.2d 981, 983 (Ala.Cr.App. 1989) ("venue is established by proof showing the county in which the crime occurred").
 II
The appellant asserts that the State failed to prove that the assault victim, Roscoe Douthit, suffered serious physical injury and that, consequently, the evidence is insufficient to support his conviction for first degree assault. *Page 85 
The appellant was charged with the form of first degree assault defined in Ala. Code 1975 § 13A-6-20(a)(1): "With intent to cause serious physical injury to another person, he causes serious physical injury to any person by means of a deadly weapon or dangerous instrument." The "serious physical injury" required for a conviction under this section is defined as "[p]hysical injury which creates a substantial risk of death, or which causes serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ." § 13A-1-2(9).
The victim, Douthit, testified that he was struck twice during the shooting, once in the foot and once in the shoulder. He displayed the scar from his shoulder wound to the jury, stating that the bullet "hit right up under [his] armpit," then "went down through [his] ribcage." R. 115. He also stated that he was taken to Stringfellow Hospital, from which he was transferred to Regional Medical Center, where he was admitted to intensive care. He testified that he remained in intensive care for "13 days or 14 days or something like that." R. 110. This was the sum of Douthit's testimony regarding his wounds. He did not testify as to any pain or suffering caused by the wounds, nor did he testify to any physical impairment caused by his injuries. Compare Haslerig v. State, 474 So.2d 196, 197-98
(Ala.Cr.App. 1985) (assault victim testified extensively as to the nature and effects of his injuries). No physician testified regarding the nature and extent of Douthit's wounds or describing the medical treatment he received. Compare, e.g.,Ware v. State, 584 So.2d 939, 941 (Ala.Cr.App. 1991) (attending physician testified that he initially " 'felt like there were potentially life threatening injuries,' " and that although a complete examination and diagnostic tests enabled him to rule out "immediate life threatening [injuries]," he did not rule out "delayed life threatening [injuries]"); Rothchild v. State, 558 So.2d at 983 (two physicians testified "that had the victim not received treatment she quite possibly would have died");Johnson v. State, 501 So.2d 1277 (Ala.Cr.App. 1986) (attending physician testified that gunshot caused damage to victim's stomach, pancreas, and abdomen, that victim "required two operations for his wound," that victim "remained in the hospital for several months," and that victim's "injury was life threatening").
By stipulation of the parties, however, medical records were introduced "to show that Roscoe Douthit was admitted to the Regional Medical Center on October 18, 1992, and admitted to intensive care for a gunshot wound to his left shoulder and arm — or his left chest and shoulder and trauma to his left ankle, and that he was in the hospital from the 18th until October 30th." R. 141-42. Although these records were not interpreted for the jury by medical personnel, a fair reading of the records reveals that the victim had a drainage tube in his chest for most of his hospitalization, C.R. 91-92; that one of his lungs collapsed at least once, C.R. 91[1]; and that surgical procedures under local anesthesia were performed on the victim on October 22, 1992, C.R. 97.
"In reviewing the sufficiency of the evidence, this court must review the evidence in the light most favorable to the prosecution. The standard of review is whether legal evidence was presented to the jury from which the jury could by fair inference find the defendant guilty beyond a reasonable doubt."Powell v. State, 576 So.2d 1285, 1288 (Ala.Cr.App. 1991) (citations omitted). Accord Johnson v. State, 555 So.2d 818,819 (Ala.Cr.App. 1989). The State's proof in this case on the element of serious physical injury leaves much to be desired. However, Douthit's testimony, combined with his medical records, was sufficient, although only minimally so, to support the jury's finding that Douthit sustained serious physical injury. See Barton v. State, 494 So.2d 943, 947-48 (Ala.Cr.App. 1986) (serious physical injury sufficiently shown where victim was hit on head with *Page 86 
rifle, injury required 11 stitches, victim was bedridden for a week, and wound left a scar). We note that this is clearlynot a case where the victim was treated and released after a brief stay in the hospital. Compare, e.g., M.T.R. v. State,620 So.2d 753, 754 (Ala.Cr.App. 1993) (no serious physical injury shown where victim was shot in shoulder and was treated and released from hospital that same day); Cowan v. State,540 So.2d 99, 101 (Ala.Cr.App. 1988) (no serious physical injury shown where shooting victim stayed overnight at hospital, but indicated "that his overnight stay was partly due to the fact that a surgeon could not see him until the next day"); Davis v.State, 467 So.2d 265, 266 (Ala.Cr.App. 1985) (no serious physical injury shown where victim was shot in hand and in arm and was treated and released from hospital that same day). In reaching this conclusion that the victim did sustain serious physical injury, neither the jury nor this Court were required to ignore "common sense, common reason, and common observation." Thompson v. State, 21 Ala. App. 498, 499,109 So. 557 (1926).
 III
The appellant also challenges the sufficiency of the evidence with regard to his two convictions for reckless endangerment. In those cases, the appellant was charged with recklessly engaging in conduct that created a substantial risk of serious physical injury to Gail Smitherman and to Matthew Dover. See Ala. Code 1975 § 13A-6-24(a). Smitherman was in the apartment over the barn during the shooting, Dover was inside the barn with several other people. The appellant contends that "the State failed to offer any proof whatsoever that the appellant knew that Dover or Smitherman was in the barn or area of the shooting. . . . [I]t is undisputed by their own testimony that they were out-of-sight." Appellant's brief at 11.
The State's evidence established that several people were near the barn when the appellant and his brother came out of the house carrying guns. Everyone except Douthit then ran into or behind the barn. Consequently, the appellant should have known that there were people in the barn. It is not necessary that he knew that certain individuals were in there. Section13A-6-24 "does not require any particular person to be actually placed in danger, but deals with potential risks, as well as cases where a specific person actually is within the area of danger." Commentary to § 13A-6-24. Firing a high-powered rifle 16 times in the direction of an occupied building clearly constitutes reckless endangerment. Cf. Stennet v. State,564 So.2d 95, 97 (Ala.Cr.App. 1990) (where evidence established that defendant "fired a shotgun at the victim's trailer while the victim and her family were inside," defendant was entitled to a charge on reckless endangerment as a lesser included offense of attempted murder); Farmer v. State, 565 So.2d 1238,1239-40 (Ala.Cr.App. 1990) (where defendant shot into an occupied dwelling, reckless endangerment was lesser included offense of discharging a firearm into an occupied dwelling). Both Smitherman and Dover were inside the building during the shooting and there was clearly a potential risk that both could have sustained serious physical injury.
For the reasons stated above, the judgment of the circuit court is affirmed.
AFFIRMED.
All Judges concur.
[1] The "Discharge Summary" signed by Dr. Kenneth L. Smith contains the following information:
 "The patient's chest tube was left on suction, but when it appeared there was no air leak, it was connected to water seal and unfortunately his lung collapsed back down. It was reconnected to suction and actually we had to increase the amount of suction to get the lung to stay up." C.R. 91 (emphasis added).