[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 497 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 498 
Samuel Ivery was convicted after a jury trial of the capital offense of murder of Deborah Lewis committed during a robbery in the first degree or an attempt thereof, see §13A-5-40(a)(2), Code of Alabama 1975. At the sentencing phase of the trial, the jury voted unanimously to recommend that Ivery be sentenced to death. At the sentencing hearing held pursuant to §§ 13A-5-47 through -52, the trial court sentenced Ivery to death by electrocution.
The facts of the crime in this case are not in dispute. The sole issue presented at trial was whether Ivery was legally insane at the time of the offense. Ivery essentially conceded the prosecution's prima facie case, raising no evidentiary objections during the state's case-in-chief, and subjected the state's witnesses to little, if any, cross-examination. The trial court's sentencing order presents a complete and correct recount of the gruesome facts of the case presented at trial.
 "[E]arly on the afternoon of August 15, 1992, the defendant, armed with a hatchet, a knife, and a hammer — all of which were concealed in a travel bag — went to the Shell [gasoline] station and convenience store in downtown Mobile. After waiting in excess of thirty minutes for the store to empty, the defendant locked the doors from the inside, robbed the victim, Deborah Lewis, of $302.00, forced Ms. Lewis to the floor, bound her hands, eyes and mouth with duct tape, and then decapitated her with a hatchet.
 "Evidence of the defendant's guilt was overwhelming. The events which took place in the store were recorded on a video tape, which was played for the jury. A hardware store clerk identified the defendant as the person to whom he had sold the hatchet in evidence on the morning of the murder. Two prosecution witnesses placed the defendant in the store just prior to the murder; a third saw him running a few blocks from the scene with what appeared to be blood on his shirt and carrying *Page 499 
a travel bag. One of the witnesses, Catonya Frost, [who] saw the defendant in the store also quoted him as telling Ms. Lewis: 'Wait until the customers leave; I'm gonna get you.'
 "Later in the afternoon, after the robbery and murder, the defendant next appeared at a shopping center north of the downtown area. A security guard at the Winn-Dixie grocery [store] was alerted that a man was washing his shirt in the bathroom of the store. The guard noticed what appeared to be blood on the defendant's shirt, and, after inquiring as to its origin, was told by the defendant that he had cut his foot. The guard also noticed the travel bag containing a hatchet and a knife and was told by the defendant that he carried these weapons for protection.
 "From the Winn-Dixie the defendant went to Big B drug store in the same complex. There he exchanged $200.00 in small denomination bills for the same amount in large denominations.
 "The defendant was arrested the day after the murder — Sunday, August 16, 1992. Sgt. Joe Connick observed the defendant walking on Government Street in downtown Mobile. When the officer started to question the defendant, he fled. After leading the police on a foot chase across the downtown area, the defendant was apprehended by Officer Karl Reed.
 "Twelve days after the crime — August 27, 1992 — police [who were] conducting an exhaustive search of abandoned houses in and around the downtown area, discovered the bag, hatchet, and a knife with a scabbard in an abandoned house at 1161 Martin Luther King Avenue. The items were seized, and fingerprint comparison of latent prints from the scabbard matched the known prints of the defendant.
 "To the charge in the indictment the defendant entered the special plea of not guilty by reason of mental disease or defect. In support of said plea, the defendant offered the testimony of Dr. Claude Brown, a psychiatrist, and Dr. Daniel Koch, a psychologist.
 "Dr. Brown diagnosed the defendant as a paranoid schizophrenic. Though Dr. Brown said the defendant could not appreciate the nature, quality, or wrongfulness of his conduct at the time of the offense, he also testified that the defendant was acting of his own free will at the time he robbed and murdered Deborah Lewis. On cross-examination, Dr. Brown testified [that] the defendant had the capacity to plan and scheme, as was evidenced by his planning and execution of the crime for which he now stands convicted.
 "Dr. Koch also diagnosed the defendant as a paranoid schizophrenic and gave his opinion that the defendant could not appreciate the nature, quality or wrongfulness of his conduct at the time of the commission of the crime. He blamed the defendant's alleged delusional disorder as the reason for beheading the victim, but even Dr. Koch admitted on cross-examination that 'in a[n] abstract sense, he does know it is wrong to kill people, but he thinks he is an exception.'
 "In rebuttal, the State presented the testimony of Dr. Richard Rogers, a forensic psychologist, Dr. George Barnard, a forensic psychiatrist, and Dr. Wilburn Rivenbark, Director of Clinical Services at the Taylor Hardin Secure Medical Facility.
 ". . . . It was Dr. Rogers's opinion that the defendant could indeed appreciate the nature, quality, or wrongfulness of his conduct in that the clinical data and the facts of the offense, as interpreted by Dr. Rogers, made it 'quite clear' that the defendant understood his behavior was against the law. Though the defendant suffered from a delusional disorder, his disorder did not interfere with his ability to know that murder was against the law. Dr. Rogers testified this delusional disorder did not automatically impair the defendant's ability to appreciate the nature, quality, or wrongfulness of his conduct.
 "Dr. George Barnard, who has conducted in excess of four thousand forensic evaluations, concluded that the defendant had a personality disorder. In Dr. Barnard's opinion, the defendant did not manifest signs or symptoms of a genuine mental illness; rather, the defendant was malingering.[1] *Page 500 
Consequently, Dr. Barnard also concluded the defendant indeed could appreciate the nature, quality, or wrongfulness of his conduct.
 "Finally, Dr. Rivenbark testified that the only symptoms of mental disease or defect he noted in evaluati[ng] the defendant were those the defendant claimed to have. Dr. Rivenbark also found significant evidence of malingering, and the defendant's history of behavior and actions at the time of the offense, coupled with later observation and evaluation, suggested the absence of a mental illness."
To this statement of facts, we add that Ivery's defense indicated that, as a result of his alleged paranoid schizophrenia, Ivery believed himself to be the "ninja of God," and to have been instructed by God to kill people at will and to take their money as the spoils of victory. With this single addition, we adopt the trial court's statement of facts as quoted for the purposes of this opinion.
At the outset, we note that many of the issues raised on appeal were not raised at the trial level. Therefore, we review these issues under the doctrine of plain error.
 " 'In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant.'
"Rule 45A, Ala. R. App. P.
 " 'The Alabama Supreme Court has adopted federal case law defining plain error, holding that " '[p]lain error' only arises if the error is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings," Ex parte Womack, 435 So.2d 766, 769 (Ala.), cert. denied, 464 U.S. 986, 104 S.Ct. 436, 78 L.Ed.2d 367 (1983) (quoting United States v. Chaney, 662 F.2d 1148, 1152 (5th Cir. 1981)).'
 "Haney v. State, 603 So.2d 368 (Ala.Cr.App. 1991), aff'd, 603 So.2d 412 (Ala. 1992), cert. denied, [507] U.S. [925], 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993). '[T]he plain-error exception to the contemporaneous-objection rule is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result." ' United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1, 14 (1985), quoting United States v. Frady, 456 U.S. 152, 163, 102 S.Ct. 1584, 1592, 71 L.Ed.2d 816 (1982). To find plain error, an appellate court must find that 'the claimed error not only seriously affected "substantial rights," but that it had an unfair prejudicial impact on the jury's deliberations.' Young, 470 U.S. at 18, 105 S.Ct. at 1047, n. 14, 84 L.Ed.2d at 14."
George v. State, [Ms. CR-94-0387, April 19, 1996] ___ So.2d ___, ___ (Ala.Cr.App. 1996).
 I.
Ivery contends that the trial court erred, during the guilt-phase jury instructions, by failing to define "wrongfulness," for purposes of § 13A-3-1, Code of Alabama 1975, as moral wrongfulness. At trial, Ivery did not object to the trial court's failure to define "wrongfulness" for the jury; therefore, our review is limited by the plain error standard.
Alabama's insanity defense statute, § 13A-3-1(a), reads:
 "It is an affirmative defense to a prosecution for any crime that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or wrongfulness of his acts. Mental disease or defect does not otherwise constitute a defense."
This statute does not define "wrongfulness"; therefore, to determine the meaning of that word in the context of the statute, we apply the principles of statutory construction. The *Page 501 
predecessor to the present insanity statute required that the defendant could not appreciate the "criminality" of his or her conduct.[2] Because the legislature changed this requirement from "criminality" to "wrongfulness," we can presume "wrongfulness" to have a meaning other than "criminality." See Norman J. Singer, Sutherland Statutory Construction, § 22.30 (5th ed. 1991) (as a general rule, "[a]n amendment of an unambiguous act indicates an intention to change the law").
Our research fails to reveal any Alabama case expressly defining the definition of "wrongfulness." Since the most recent amendment to this statute, this court has considered this phrasing only once. In Ware v. State, 584 So.2d 939
(Ala.Cr.App. 1991), holding that the jury could have reasonably concluded that the appellant was able to appreciate the wrongfulness of his acts, this court said:
 " ' "[c]onsciousness of the moral or legal criminality of the act, with connectedness in the employment of the reasoning faculty, while not conclusive evidence of sufficient sanity to justify criminal punishment, are nevertheless strong circumstances tending to prove legal accountability." ' Cunningham v. State, 426 So.2d 484, 491 (Ala.Cr.App. 1982) (quoting Boswell v. State, 63 Ala. 307, 320 (1879))."
Id., at 947 (Bowen, J., applying § 13A-3-1(a) (Supp. 1990)). Because Ware notes that a prosecution may rebut an insanity defense with evidence that a defendant appreciated either the moral or legal wrongfulness of his acts, the Ware court apparently assumed that Alabama's insanity defense requires that the defendant show that he was unable to appreciate both
the moral and legal wrongfulness of his actions.
There is a split of authority among jurisdictions that have defined "wrongfulness" in this context. Some jurisdictions have defined "wrongfulness" as relating to a defendant's appreciation of moral wrongfulness only, see, e.g.,United States v. Sullivan, 544 F.2d 1052 (9th Cir. 1976); Blake v.United States, 407 F.2d 908 (5th Cir. 1969), modified by UnitedStates v. Lyons, 731 F.2d 243 (5th Cir. 1984); United States v.Freeman, 357 F.2d 606 (2d Cir. 1966); People v. Schmidt,216 N.Y. 324, 110 N.E. 945 (N.Y. 1915); others have defined "wrongfulness" as relating to a defendant's appreciation of either moral wrongfulness or legal wrongfulness (i.e., criminality), see, e.g., People v. Skinner, 39 Cal.3d 765,217 Cal.Rptr. 685, 704 P.2d 752 (1985) (holding that, to support an insanity defense, a defendant must show either an inability to appreciate moral wrongfulness or an inability to appreciate legal wrongfulness); and an acute minority has defined it to apply only when a defendant fails to appreciate both the moraland legal wrongfulness of his acts, see, e.g., State v.Crenshaw, 27 Wn. App. 326, 617 P.2d 1041 (1980), aff'd,98 Wn.2d 789, 659 P.2d 488 (1983) (holding that, to support an insanity defense, defendant must show both an inability to appreciate moral wrongfulness and an inability to appreciate legal wrongfulness). If it were ultimately decided that the construction offered in Ware is the proper definition in Alabama, Alabama would be included in this last category.
The definition of "wrongfulness," as that term is used in § 13A-3-1, remains an open question in Alabama. However, for the reasons discussed below, this is not the case to answer the question. Because of the particular circumstances of the case, we hold for two reasons that the trial court did not commit plain error by failing to define "wrongfulness" during its charge on the insanity defense.
 A.
When a term is included in a statute relevant to a case, and that term is not defined by statute, whether it is necessary for the trial court to define the term for the *Page 502 
jury hinges on the facts of the case. See Thornton v. State,570 So.2d 762 (Ala.Cr.App. 1990). Evidence that Ivery knew his actions were "wrong", as that word is commonly used, was overwhelming and was elicited from both defense and prosecution witnesses. Instead of focusing on the "wrongfulness" component of the insanity defense, Ivery's attorney pursued a reasonable defense focusing on Ivery's alleged inability to "appreciate" the wrongfulness of his acts. This court has recognized that the issues of "wrongfulness" and "appreciate" are separate and distinct. See Brown v. State, 686 So.2d 385, 402 (Ala.Cr.App. 1995) (approving, in a capital case, the trial court's penalty-phase jury instructions, which stated, in part, as follows: " '[a] person's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law is not the same as his ability to know right from wrong. . . . A person may indeed know that doing the act that constitutes a capital offense is wrong and still not appreciate its wrongfulness because he does not fully comprehend or is not fully sensible to what he is doing or how wrong it is.' "). Seealso United States v. Freeman, 357 F.2d 606, 623 (2d Cir. 1966) ("[M]ere intellectual awareness that the conduct is wrongful, when divorced from appreciation or understanding of the moral or legal import of behavior, can have little significance.").
Both of Ivery's expert witnesses testified that Iveryknew that it was wrong to kill the victim, but that hisappreciation of that fact was impaired by his alleged command from God.[3] During his closing, even defense counsel did not distinguish between moral and legal wrongfulness. Instead, defense counsel argued that because of an alleged directive from God, Ivery was unable to appreciate the wrongfulness of his acts. Ivery's counsel argued:
 "Now all the experts also have told you that a person suffering from schizophrenia and paranoi[d] schizophrenia may be able to know that it's not right to kill. They can — in the limited sense of the word appreciate, and that's the key word, appreciate, the nature of their actions. They know it's wrong to kill but the mental disease itself can be so severe that they feel it doesn't apply to them."
". . . .
 "[Dr. Brown] told you — he told you unequivocally in my direct and on cross-examination, 'Yes, Samuel Ivery knew what he was doing was wrong.' He appreciated the wrongfulness of his acts, but before you can conclude that, you've got to focus in on the word 'appreciation'. Yes, Sam knew it was wrong."
(R.693-94).
Under these circumstances, it was not plain error for the trial court not to consider "wrongfulness" as a distinct issue in Ivery's defense. Under the defense's theory, it was not even an issue. Thus, we find no plain error in the trial court's failure to define "wrongfulness" for the jury. We believe that the meaning of "wrongfulness," to the extent that word was used in this case, could be "understood by the average juror in [its] common usage." Thornton, 570 So.2d at 772.
 B.
Moreover, even assuming that the trial court should have given the jury an instruction that "wrongfulness" means only moral and not legal wrongfulness (assuming, as Ivery argues on appeal, that Alabama's insanity defense statute would warrant such a definition), we still would find no plain error. Had the jury been given the "moral wrongfulness" definition, it would have reached the same ultimate question it in fact reached without such a definition: whether Ivery acted under a delusional directive from God. By way of explanation, we note that the defense theory in essence was that although Ivery knew his conduct was legally wrong, he could not appreciate that wrongfulness because he was compelled by a delusion to act. *Page 503 
Thus, the determinative question before the jury was whether Ivery was acting under a delusionary directive from God. If the defense had asserted at trial that Ivery did not know his actions were morally wrong and if the jury had been instructed that "wrongfulness" means moral wrongfulness, then the question for the jury would have been whether that wrongfulness that Ivery could not presumably appreciate was moral wrongfulness because he was compelled to act because of the directive from God. That determination leads to the same ultimate question that was in fact submitted to the jury: whether Ivery was acting under a delusional directive from God. Because the jury rejected this theory in returning its verdict, it is beyond argument that it would also have rejected this theory had it been given the definition of "wrongfulness" now urged. The jury was given the same ultimate determination that would have been submitted to it under "moral wrongfulness"; therefore, any error in the court's failure to give that definition was not plain error.
 II.
Ivery contends that the trial court's findings regarding mitigating circumstances, as reflected in the sentencing order, are flawed in two respects.
 A.
Ivery contends that the trial court erred by not finding certain alleged statutory mitigating circumstances: specifically, Ivery challenges the trial court's findings that Ivery did not commit the act constituting the capital offense while under the influence of extreme mental or emotional disturbance, see § 13A-5-51(2); that Ivery's ability to appreciate the criminality of his conduct was not substantially impaired or that his ability to conform his conduct to the law was not substantially impaired, see § 13A-5-51(6). We review this issue under the plain error standard.
During the sentencing phase of a capital proceeding, a defendant's burden of proof regarding the mitigating circumstance found in § 13A-5-51(6) is substantially less than his burden during the guilt phase, of proving the defense of not guilty by reason of mental disease or defect. See Lewis v.State, 380 So.2d 970, 977 (Ala.Cr.App. 1979) ("the extent of sub-normal mental capacity [shown in support of this mitigating factor] does not have to measure up to the applicable test necessary to show. . . . insanity that makes one incapable of committing a crime"), cert. denied, 370 So.2d 1106 (Ala. 1979);Whisenhant v. State, 370 So.2d 1080, 1095-96 (Ala.Cr.App.), cert. denied, 370 So.2d 1106 (1979) (a finding that a diminished capacity mitigating circumstance exists "may be based on evidence of a lesser standard than is necessary to find insanity.").
The trial court's sentencing order states that the expert testimony regarding Ivery's mental and emotional condition at the time of the offense was conflicting. We agree. As a general rule, the finder of fact is not bound by an expert's opinion, even if that opinion is uncontroverted. Carroll v. State,599 So.2d 1253 (Ala.Cr.App. 1992), aff'd, 627 So.2d 874 (Ala. 1993), cert. denied, Carroll v. Alabama, 510 U.S. 1171,114 S.Ct. 1207, 127 L.Ed.2d 554 (1994). The state presented ample evidence from which the trial court could properly conclude that Ivery's alleged insanity defense was a sham. (That expert testimony is discussed in detail in our consideration of other issues in this case.) We find no error in the trial court's holding that the prosecution disproved these alleged mitigating circumstances by a preponderance of the evidence.
 B.
Ivery contends that the trial court failed to enter any findings regarding the existence or nonexistence of nonstatutory mitigating circumstances, as it is required to do under § 13A-5-52. In its sentencing order, the trial court stated that it "thoroughly and conscientiously considered all statutorily enumerated mitigating circumstances as well as any non-statutory mitigating circumstances which might reasonably apply." However, the sentencing order fails to specify whether the trial court in fact found any nonstatutory mitigating circumstances to exist. *Page 504 
 "In capital cases, it is the duty of this court to independently determine whether the sentence of death is appropriate in each particular case. In order to reach this conclusion, we must reweigh the aggravating circumstances against the mitigating circumstances as found by the trial court. See Hooks v. State, 534 So.2d 329
(Ala.Cr.App. 1987), aff'd, 534 So.2d 371 (Ala. 1988), cert. denied, 488 U.S. 1050, 109 S.Ct. 883, 102 L.Ed.2d 1005 (1989)."
Guthrie v. State, [Ms. CR-94-0388, February 9, 1996] ___ So.2d ___, ___ (Ala.Cr.App. 1996); see also Whisenhant, supra. In this case, the trial court failed to state whether it found any nonstatutory circumstances. Without this finding in the record, we are unable to review the propriety of the sentence of death. Therefore, we find that, in this regard, the trial court's sentencing order is in error. We must remand this case to the trial court for that court to enter into the record specific findings as to the existence or nonexistence of any nonstatutory mitigating factors that it may have considered in sentencing Ivery to death.
 III.
Ivery contends that the prosecutor's conduct during closing arguments was inflammatory and unduly prejudicial and that it thereby denied him a fair trial.
 "Questions of the propriety of argument of counsel are largely within the trial court's discretion, McCullough v. State, 357 So.2d 397, 399
(Ala.Cr.App. 1978), and that court is given broad discretion in determining what is permissible argument. Hurst v. State, 397 So.2d 203, 208
(Ala.Cr.App.), cert. denied, 397 So.2d 208 (Ala. 1981). Moreover, this Court has stated that it will not reverse unless there has been an abuse of discretion. Miller v. State, 431 So.2d 586, 591
(Ala.Cr.App. 1983).
". . . .
 ". . . In reviewing allegedly improper prosecutorial comments, conduct, and questioning of witnesses, the task of this Court is to consider their impact in the context of the particular trial, and not to view the allegedly improper acts in the abstract. Whitlow v. State, 509 So.2d 252, 256 (Ala.Cr.App. 1987); Wysinger v. State, 448 So.2d 435, 438 (Ala.Cr.App. 1983); Carpenter v. State, 404 So.2d 89, 97 (Ala.Cr.App. 1980), cert. denied, 404 So.2d 100 (Ala. 1981). Moreover, this Court has also held that statements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued at their true worth and are not expected to become factors in the formulation of the verdict. Orr v. State, 462 So.2d 1013, 1016
(Ala.Cr.App. 1984); Sanders v. State, 426 So.2d 497, 509 (Ala.Cr.App. 1982)."
Bankhead v. State, 585 So.2d 97, 105-07 (Ala.Cr.App. 1989), remanded on other grounds, 585 So.2d 112 (Ala. 1991). Although conclude that the prosecutor's conduct in three instances discussed below was inappropriate, none of these indiscretions results in reversible error. We have also examined the cumulative effect of the prosecutor's misconduct under the plain error standard and find no plain error.
 A.
Ivery contends that, during rebuttal to Ivery's guilt-phase closing arguments, the prosecutor characterized Ivery's defense in terms that Ivery alleges were "an obvious attempt to have the jury base its verdict on racial bias and stereotypes rather than on a rational assessment of the evidence." See McNair v.State, 653 So.2d 320 (Ala.Cr.App. 1992). The specific comment at issue is as follows:
 "To everything there is a season and a time to every purpose unto heaven. And scripture tells us there is a time to rend or reap what one has sown and he needs to know that, quote, this is not another case of niggeritous.[4] He needs to know that it's not just, 'I killed the bitch, that's it.' " *Page 505 
(R. 713) (emphasis added). Ivery's counsel did not object to this statement; therefore, our review of this issue is bound by the limits of the doctrine of plain error. See George.
We construe the statement at issue to be an impression drawn from the following testimony, which was elicited by the prosecutor during cross-examination from one of Ivery's expert witnesses:
 "Q: Now, you have alluded in your testimony to those feelings about the human race, but they go beyond that, do they not, in the specific sense that Mr. Ivery hates black women, doesn't he?
"A: That's correct.
 "Q: And at times he refers to them in rather disparaging ways, doesn't he?
"A: Correct.
 "Q: And in his conversation with you about the murder of Deborah Lewis did he not refer to it, 'A typical nigger visitation'?"
"A: Right."
(R.407.) Thus, the prosecutor elicited testimony at trial that suggested that Ivery killed the victim because he hated black women. In the comment at issue, the prosecutor appears to argue that hatred of blacks, i.e. "niggeritous," is neither a justification nor an excuse for murder.
Had the prosecutor stated his argument as we have paraphrased it, our disposition of this issue would require little discussion. Unfortunately, the prosecutor chose to make his point using an emotionally charged racial slur. The use of such offensive terms may induce verdicts that are so tainted by the specter of prejudice that they run afoul of the right to a fair trial. See Powers v. Ohio, 499 U.S. 400, 411-13,111 S.Ct. 1364, 1371-72, 113 L.Ed.2d 411, 426 (1991). Our appellate courts have held arguments calculated to invoke racial prejudice in the jury to be improper. See, e.g., Moulton v.State, 199 Ala. 411, 412, 74 So. 454 (1917) (holding the prosecutor's following comments to be improper: " 'If you do not hang this negro, you will have a similar crime in this county in six months. . . . Unless you hang this negro, our white people living out in the country won't be safe; to let such crimes go unpunished will cause riots in our land. . . . I hope to God the day will never come in this country when the heel of the Ethiopian will be on the neck of the Caucasian.' "); Tannehill v. State, 159 Ala. 51, 52, 48 So. 662 (1909) (holding the following argument by a prosecutor to be improper: " 'The only defense to these confessions of the defendant, with the corroborating facts shown by [two witnesses], is the alibi set up by a lot of negro witnesses. Why, gentlemen, if you acquit this man on such an alibi as this, you can never expect to convict another negro of a crime in this country. You know the negro race — how they stick up to each other when accused of crime, and that they will always get up an alibi, prove it by perjured testimony of their own color, and get their accused companion cleared if they can.' "); Simmons v. State, 14 Ala. App. 103,104, 71 So. 979 (1916) (holding the prosecutor's following remark to be improper: " 'You must deal with a negro in the light of the fact that he is a negro, and applying your experience and common sense.' "). In some cases, such race baiting has been cause for reversal. See, e.g., Moulton, supra;Simmons, supra. Accordingly, we condemn the prosecutor's use of such language.
However, in the context of this particular case, we do not believe the comment was so prejudicial as to amount to plain error.
 " 'Each case of this character must be decided upon its own merits. There is no horizontal rule by which these qualities [the prejudicial qualities of improper remarks in argument to the jury] can be ascertained in all cases. Much will depend upon the issues, the parties, and the general atmosphere of the particular case.' "
Moulton, 199 Ala. at 414, 74 So. at 455 (quoting BirminghamRy., Light Power Co. v. Gonzalez, 183 Ala. 273, 287,61 So. 80, 84 (1913)). The substance of the comment now at issue was a legitimate inference drawn from the testimony of one of Ivery's expert witnesses, and was, therefore, within the proper scope of closing arguments. See Sanders v. State, 423 So.2d 348
(Ala.Cr.App. *Page 506 
1982). The regrettable fact that the prosecutor couched this statement in racially offensive language does not, under the plain error standard of review, "so infect the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 106 S.Ct. 2464,91 L.Ed.2d 144 (1986).
Ivery also contends that it was improper for the prosecutor to argue that Ivery was attempting to manipulate the criminal justice system by allegedly feigning mental illness. He argues that this is an "unfounded and offensive assumption."
Our review of the record leads us to the conclusion that the prosecutor's comment was a permissible and legitimate inference from the evidence. The prosecutor clearly presented ample evidence at trial to support the inference that Ivery had feigned mental illness in the hopes of escaping a conviction for capital murder. See Sanders, supra. In rebuttal to Ivery's defense witnesses, each of whom testified that Ivery was a paranoid schizophrenic, the prosecutor produced three expert witnesses in the field of mental health, each of whom testified that Ivery was "malingering". Dr. Rogers, a forensic psychiatrist and a nationally recognized authority on malingering, opined, after conducting and analyzing several tests regarding Ivery's mental state, that Ivery was feigning several symptoms of his alleged mental illness. Dr. Barnard, a forensic psychiatrist, opined, based upon two interviews with Ivery and a review of Ivery's medical and police records, that Ivery's alleged delusions were fabricated and that his mental illness was feigned. Dr. Rivenbark, a clinical psychologist, opined, based on a 30-day observation of Ivery and two clinical interviews, that Ivery was malingering or at least grossly exaggerating symptoms of mental disease. The prosecutor also introduced into evidence hospital records from Ivery's 1980-81 stay at California's Atascadero State Mental Hospital. These records shows that Ivery told the staff at that hospital that his mental illness was feigned, and that "he had concocted an alter personality he named 'Mac' as a ruse to fool the doctors who examined him and thereby avoid the Department of Corrections."
 B.
Following the conclusion of guilt-phase closing arguments, the court recessed for 15 minutes. The jury then returned to the courtroom and the following colloquy occurred at a sidebar:
 "[DEFENSE COUNSEL]: Judge, I suppose for the record I need to make a motion for a mistrial as to the theatrics of the district attorney during the closing — or during his rebuttal in taking the hatchet and slamming it down on the podium. I feel it is inappropriate as far as rebuttal is concerned and it's only designed to inflame the jury. I feel, I guess, I have to make that motion.
 "[PROSECUTOR]: I would simply like to say for the record that Dr. Riddick testified that [the victim] was struck at least seven times with a sharp force instrument. The record more further contains a video in evidence and a still photograph which shows a hatchet in a swing-type position and the use of the hatchet on the podium was a reasonable inference to be drawn from the testimony of Dr. Riddick, the video and the still photographs as demonstrating how the victim died.
"THE COURT: Deny the motion and note your exception." (R.713-14.) Ivery's counsel failed to object when the conduct occurred and failed to moved for a mistrial until well after the conclusion of closing arguments. Ivery's motion for a mistrial was untimely; therefore, if this case were not a death case, this issue would be procedurally barred from appellate review. See Fuller v. State, 365 So.2d 1010 (Ala.Cr.App. 1978), cert. denied, 365 So.2d 1013 (Ala. 1979). Here, however, we review this issue under the doctrine of plain error.
The colloquy set out above shows that the prosecutor picked up the hatchet during his closing argument, and at some point during the course of his argument, slammed the hatchet into the podium. We denounce such reckless theatrics. Similar demonstrations by prosecutors in other jurisdictions have been roundly criticized and held to be improper. See, e.g., Peoplev. Lee, *Page 507 242 Ill. App.3d 40, 610 N.E.2d 727, 182 Ill.Dec. 858 (1993), appeal denied, 156 Ill.2d 562, 638 N.E.2d 1121, 202 Ill.Dec. 927 (the prosecutor picked up the sawed-off shotgun allegedly used in the armed robbery, cocked it, and pointed it at the jury);Pickens v. State, 850 P.2d 328 (Okla.Cr.App. 1993), cert. denied, Pickens v. Oklahoma, 510 U.S. 1100, 114 S.Ct. 942,127 L.Ed.2d 232 (1994) (the prosecutor picked up the gun used in the murder and pretended to fire it); Ellis v. State,867 P.2d 1289, 1297 (Okla.Cr.App. 1992), cert. denied, Ellis v. Oklahoma, ___ U.S. ___, 115 S.Ct. 178, 113 L.Ed.2d 232 (1994) (the prosecutor picked up the gun used in the murder, "paraded in front of the jury, pretending to be [the appellant]," pointed the gun at the ground, and "dry-fired" it); Brewer v. State,650 P.2d 54 (Okla.Cr.App. 1982), cert. denied, Brewer v.Oklahoma, 459 U.S. 1150, 103 S.Ct. 794, 74 L.Ed.2d 999 (1983) (the prosecutor displayed a 16-inch by 20-inch color photograph of the victim's semi-nude and bludgeoned body, and stabbed the photo four times with the knife used in the murder). Likewise, we find that in this case, the prosecutor's conduct was highly inappropriate.
However, to merit reversal under the plain error standard, a prosecutor's conduct must not only be improper, but must also be prejudicial to the substantial rights of the accused.See George. The issue of whether Ivery decapitated the victim was not in dispute, having been conceded in the testimony of Ivery's expert witnesses. A video of the circumstances of the murder was played before the jury and entered into evidence. One portion of that video depicts what appears to be the blurred image of a hatchet swinging in a downward motion and in the direction of where the victim was later found dead. The hatchet itself was admitted into evidence without objection and the testimony of several witnesses indicated that it had been used to decapitate the victim. Further testimony indicated that the victim was alive immediately before her head was cut off. Ivery's counsel did not object when the prosecutor slammed the hatchet into the podium. There was no request for curative instructions. The record is silent as to the effect that this spectacle may have had on the jury. Based upon the facts of this case — notably, the overwhelming and unchallenged evidence regarding Ivery's use of the hatchet in concert with the hollow state of the record on this issue — we cannot say that this display, although improper, rises to the level of plain error.
 C.
Ivery contends that, during both the guilt phase and the sentencing phase, the prosecution misled the jury regarding the law applicable to the case. It is improper for the prosecutor either to misstate to the jury, the applicable law, or to otherwise mislead or confuse the jury as to the law applicable to the case. Bland v. State, 395 So.2d 164 (Ala.Cr.App. 1981); and Wade v. State, 381 So.2d 1057 (Ala.Cr.App.), cert. denied, 381 So.2d 1062 (Ala. 1980).
 1.
Ivery contends that, during sentencing-phase closing arguments, the prosecutor inaccurately stated that "wrongfulness," as that term is used in § 13A-3-1, means legal wrongfulness rather than moral wrongfulness. Ivery argues, as discussed above, that this statement of the law was incorrect and prejudicial.
Although the overall tenor of the prosecutor's closing argument indicates that he believed the definition to encompass only legal wrongfulness, and he focused on testimony that showed that Ivery knew his actions were illegal, the record does not show that the prosecutor made any attempt to expressly define "wrongfulness." The prosecutor did not address the question of whether Ivery knew that his actions were immoral. The prosecutor's comments simply did not discuss "wrongfulness" in terms of morality. He neither endorsed nor foreclosed an interpretation of "wrongfulness" that embraces moral wrongfulness.
Ivery's counsel did not object on these grounds at trial; therefore, we review this issue under the plain error standard. We cannot conclude either that the prosecutor attempted to mislead the jury, or that the jury was likely to have been misled by the prosecutor's argument. Moreover, as we discussed *Page 508 
above, the definition of wrongfulness was not at issue in this case. We find no plain error in these remarks.
 2.
Ivery contends that, during the penalty-phase closing arguments, the prosecution misled the jury as to the proof necessary to support a finding of the mitigating circumstance "that the defendant acted under the influence of extreme mental or emotional disturbance." Ivery cites the following statement made by the prosecutor:
 "The offense was committed while the Defendant was under the influence of extreme mental or emotional disturbance. I would submit to you with all due respect by finding him guilty and not finding him guilty by reason of mental disease or defect, you have already ruled that out."
Ivery claims that this statement misinforms the jury by implying that, as a matter of law, a rejection of the insanity defense at the penalty phase precludes a finding of "extreme mental or emotional disturbance" as a mitigating factor in the sentencing phase. See Lewis and Whisenhant, supra. Ivery's counsel did not object to this statement at trial; therefore, we review this issue under the standard of plain error.
We do not read this remark to be the prosecutor's expression of a statement of the law. The prosecutor did not refer to the burden of proof; rather, he guessed at a conclusion that the jury may have drawn during its deliberations in the guilt phase of the trial. As such, this statement is merely an argument regarding a disputed matter of fact, i.e., the basis of the jury's rejection of Ivery's defense, and not a statement of the law. Therefore, this statement was not likely to have misled the jury regarding the requisite burden of proof applicable to the issue of this mitigating circumstance, and Ivery's substantial rights were not affected.
Moreover, even if this statement were considered as a misstatement of the law, as Ivery claims, the trial court subsequently defined for the jury the correct burden of proof regarding mitigating circumstances:
 "A mitigating circumstance considered by you should be based on the evidence you have heard. When the factual existence [of a] mitigating circumstance [is] in dispute, the State shall have the burden of disproving the factual existence of that circumstance by a preponderance of the evidence.
 "The burden of disproving by a preponderance of the evidence means that you are to consider that the mitigating circumstance does exist unless taken into evidence as a whole it is more likely than not the mitigating circumstance does not exist. Therefore, if there is a factual dispute over the existence of mitigating circumstance then you should find and consider that mitigating circumstance unless you find the evidence is such that [it] is more likely than not that [that] mitigating circumstance does not exist. Only an aggravating circumstance must be proven beyond a reasonable doubt."
(R.772.) The jury was properly informed of the law regarding this issue, and we find no plain error here.
 3.
Ivery contends that the prosecutor misled the jury regarding its role in the consideration of aggravating circumstances. Specifically, Ivery challenges the following statement made by the prosecutor during the penalty-phase opening arguments:
 "We are going to offer evidence of three aggravating circumstances, two of which have already been proven beyond a reasonable doubt, the third having been proven by the introduction of the certified copy of his robbery conviction."
The two aggravating circumstances the prosecutor claims in this passage to have been proven beyond a reasonable doubt are 1) that the capital felony was committed in the course of a robbery and 2) that the crime was especially heinous, atrocious or cruel when compared to other capital offenses. Ivery's contention hinges on his claim that the prosecutor's statement removed from the jury's consideration the issue of whether this act was especially heinous, atrocious, or cruel, and instead instructed the jury that that issue had already been decided. We disagree *Page 509 
with that interpretation of this statement.
We read this passage as a statement of the prosecutor's belief that he had presented in the guilt phase of the trial ample evidence to satisfy his burden of proving that this crime was especially heinous, atrocious, or cruel when compared to other capital offenses. We find no plain error here. Hunt v.State, 659 So.2d 933 (Ala.Cr.App. 1994), aff'd, Ex parteHunt, 659 So.2d 960 (Ala.), cert. denied, Hunt v. Alabama, ___ U.S. ___, 116 S.Ct. 215, 133 L.Ed.2d 146 (1995) (finding no plain error in prosecution's guilt-phase jury arguments, which included the following: "Ladies and gentlemen, this case is beyond reasonable doubt. It is well beyond that. It's overwhelming as to guilt.").
 D.
Ivery contends that the trial court erred by allowing the prosecutor, over objection, to cross-examine Dr. Koch, an expert witness, on the question whether Dr. Koch complied with the trial court's discovery order. The trial court overruled Ivery's objection, ruling that the prosecutor's anticipated showing that Dr. Koch had refused to comply with the trial court's order would be permissible subject matter for impeachment purposes. The prosecutor attempted to impeach Dr. Koch, as follows:
 "Q: Dr. Koch, after you arrived at a diagnosis and a conclusion, did you prepare a report detailing your the conduct of your evaluation, its component parts, and your conclusion?
"A: I did not.
 "Q: You did not, sir? Were you aware, sir, of an order signed by this Judge on December 15, 1993 that said 'Dr. Claude, Dr. Daniel Koch and Dr. Richard Rogers shall produce for the inspection of their — for the inspection of the State their respective reports articulating their opinions of the Defendant's state of mind at the time of the alleged offense to include the following: Whether Samuel Ivery suffered from a mental disease or defect on August 15, 1992, if so, the nature of the mental disease or defect and, if so, whether the mental disease or defect affected his ability to appreciate the nature, quality, wrongfulness of his conduct.' And that these reports were to be produced no later than December 17, 1993?
". . . .
"A: I am aware of that.
 "Q: It was personally served at your office, was it not?
 "A: I don't believe so. I think it came in the mail. I know I got — I know when I got the report — when I got that order, it would have been requesting that the report be sent the next day and I did not take that — I'd like to look at it if I may. I did not take that as an order for me to prepare a report but rather to deliver what report I might have prepared.
 "(Reading) 'Shall produce for the inspection their respective reports articulating their opinions.' I had written no report.
"THE COURT: You've answered his question.
 "Q: So you didn't interpret that report to mean that you were to prepare a written document?
"A: I did not.
". . . .
 "A: Yes, I didn't interpret that as an instruction to prepare a report; merely to submit, had I one in hand.
 "Q: You've got a master's degree, do you not, sir — Ph.D?
"A: Yes, I do.
 "Q: So it's safe to say you understand the English language, don't you?
"A: I think I do.
 "Q: Don't you think that 'Dr. Daniel Koch shall produce for the inspection of the State,' to mean just that?
 "A: I think 'shall produce' means that you give —
". . . .
 "A: — bring forth what you have. It doesn't mean create.
"THE COURT: He's answered the question."
(R.468-73.)
This testimony failed to " 'discredit [the] witness, or . . . reduce the effectiveness *Page 510 
of his testimony by bringing forth evidence to show why faith should not be accorded his testimony.' " Brown v. State,545 So.2d 106, 115 (Ala.Cr.App. 1988), aff'd, Ex parte Brown,545 So.2d 122 (Ala.), cert. denied, Brown v. Alabama, 493 U.S. 900,110 S.Ct. 257, 107 L.Ed.2d 206 (1989) (quoting Shroeder, Hoffman and Thigpen, Alabama Evidence, § 6-1 (1987)). Therefore, the prosecutor's attempt to impeach Dr. Koch was unsuccessful. Furthermore, the facts elicited during this colloquy were unlikely to prejudice Ivery's defense in the eyes of the jury, and more likely to prejudice the prosecution. We need not consider whether Dr. Koch's alleged noncompliance with the discovery order would be proper impeachment material, because, if it was error to allow the prosecution to cross-examine Koch on this issue, that error was harmless. See
Rule 45, Ala. R. App. P.
The prosecutor referred to his Quixotic impeachment attempt during his closing argument, as follows: "[I]n assessing the credibility that you may or may not give to the testimony of Daniel Koch, I ask you to consider that he defied the orders of this Court and never submitted a written report like he was supposed to do." This comment was not supported by the evidence and, therefore, was improper. However, Ivery's counsel did not object to this statement, and our review of this issue is accordingly limited by the plain error standard. Both the trial court and the prosecutor instructed the jury to base its conclusions on the testimony and the evidence, and further instructed the jury that the arguments of counsel were not to be considered as evidence. The jury is presumed to abide by the trial court's instructions. We cannot say that this statement "so infected the trial with unfairness . . . that the appellant was denied due process." Jenkins v. State, 627 So.2d 1034, 1050
(Ala.Cr.App. 1992), aff'd, 627 So.2d 1054 (Ala. 1993), cert. denied, Jenkins v. Alabama, 511 U.S. 1012, 114 S.Ct. 1388,128 L.Ed.2d 63 (1994). We find no plain error in this statement.
 E.
Ivery contends that during the penalty phase the prosecutor told the jury that it was its duty to sentence Ivery to death. We recognize the impropriety of such an argument, seeUnited States v. Young, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1
(1985); however, Ivery's interpretation of the prosecutor's remarks is strained.
Ivery advances this argument on the basis of two isolated phrases from the following portion of the prosecution's argument:
 "I do not presume to tell you what your duty is. You know what's in your own mind. You know what is in your own heart. But I would respectfully suggest to you that somewhere, sometime, somebody has got to draw the line and say enough is enough. And it happens to be your fate by virtue of your selection as jurors in this case, which, in part, was based on your response to this question in the affirmative: 'If you find him guilty and if you are satisfied that aggravation outweighs mitigation could you look at him and say, "I sentence you to die"?' and you under oath said you could. And if you find him to be sentenced to death, understand, no one is going to jump up and down and clap. The balloons are not going to fly. We're not going to drape the courtroom in crepe paper, but we can all walk out of here with the knowledge that we did what we had the wisdom to see [was] right and the courage to do it. Nobody is going to walk out of here a winner. Deborah Lewis is dead. And there's nothing we can do to bring her back. No one is going to walk out of here feeling good. But, again, you can walk out of here with the knowledge that you saw your duty and had the courage to do it."
The substance of these remarks is to impress upon the jurors the gravity of their decision and to remind them that they are to weigh the aggravating circumstances against the mitigating circumstances in determining for themselves their duty. As such, there was nothing improper in these remarks.
Ivery further contends that the prosecutor committed plain error throughout the course of his closing arguments, by referring to God's law and couching his arguments *Page 511 
in religious terms.[5] There being no objection at trial on these grounds, we review this issue under the doctrine of plain error. The prosecution's references to God's law and to religion in this case were not improper. See Wright v. State,279 Ala. 543, 550-51, 188 So.2d 272 (1966) ("Argument of counsel should not be so restricted as to prevent reference, by way of illustration, to historical facts and public characters, or to principles of divine law or biblical teachings.");Grayson v. State, 675 So.2d 516 (Ala.Cr.App. 1995), cert. denied, 675 So.2d 516 (Ala. 1996).
 IV.
Ivery contends that the trial court erred in refusing to grant his request for a jury instruction on the consequences of the jury's returning a verdict of not guilty by reason of mental disease or defect.
During the charge conference, defense counsel expressed his request as follows: "Judge, I think also I would request that the jury be instructed that in the event that [it returns] a verdict of not guilty that it be instructed that the State then would commence civil commitment proceedings." The trial court denied Ivery's request, stating, "It looks like to me that if you can argue that he's going to be put into a hospital then the State would have to be able to come back and argue if he is put in a hospital he can be released at any time," and noting that such argument would be improper.
The requested charge was properly refused because it is not a correct statement of the law. The commitment of a criminal defendant found not guilty by reason of mental disease or defect is not pursuant to a civil commitment proceeding. "Under Alabama law, civil commitments and commitments of persons found not guilty by reason of mental disease or defect are governed by separate statutes. Civil commitments are handled by the probate court." Committee Comments, Rule 25.2, Ala. R. Crim. P. Furthermore, initiation of commitment proceedings of a criminal defendant found not guilty by reason of mental disease or defect is mandated by § 15-16-41 and Rule 25.2(a), not initiated by the state. Section 15-16-41 states, in part, "If a defendant in a criminal case is found not guilty by reason of insanity, the court shall forthwith determine whether the defendant should be held for a hearing on the issue of his involuntary commitment to the Alabama State Department of Mental Health." Rule 25.2(a) reads, "If the defendant is found not guilty by reason of mental disease or defect, or not guilty and not guilty by reason of mental disease or defect, the court shall forthwith determine whether the defendant should be held for hearing on the issue of his involuntary commitment under Rule 25.3." It is not the state's responsibility, but the court's responsibility to follow the mandates of § 15-16-41 and Rule 25.2(a) and initiate commitment proceedings. In finding no error here, we note that the trial court's observation that such a requested instruction could lead to error is founded upon Alabama caselaw. In Gray v. State, 482 So.2d 1318, 1320-21
(Ala.Cr.App. 1985), in upholding the trial court's refusal to instruct the jury, pursuant to a question by a juror, on the consequences of a verdict of not guilty by reason of insanity, the court stated the following:
 "[T]his issue is not within a jury's sphere of concern.
 " 'Clearly the sole question in this connection was whether [the] defendant was "not guilty by reason of insanity."
 " 'What might happen if he were sent to the insane asylum, instead of the penitentiary, should not have been thrown into the case to influence the verdict.' Boyle v. State, 229 Ala. 212, 225, 154 So. 575, 587 (1934).
 "Under Alabama's new Criminal Code, the trial court, and not the jury, determines the punishment. § 13-5-1."
See also Whisenhant v. State, 370 So.2d at 1102 (in finding that the prosecutor's closing argument remarks on the consequences of a *Page 512 
verdict of not guilty by reason of insanity constituted reversible error, the court reviewed similar cases and stated, "[h]ere, as in the above cited cases, the sole issue for the jury was appellants' responsibility at the time the offense was committed").
 V.
Ivery contends that the trial court's alleged failure to conduct individual voir dire of the veniremembers deprived him of a fair trial and reliable punishment determination.
Foremost, we find from our review of the record that the trial court did conduct individual voir dire and, further, that the standard of review for this issue is plain error. Although the record contains a motion by Ivery for individual voir dire, the record contains no ruling on this motion. During the questioning of the veniremembers, they were asked, as a group, if any one of them had heard anything about this case through the media. Forty-three veniremembers responded that they had, but were not allowed to reveal what they had heard. (It appears that there were 60 veniremembers). In regard to certain questions, those veniremembers answering them were asked to give their answers at the bench. One of those questions was whether any one had any reason, other than what had already been covered, why he or she could not sit on the jury. After the trial court and the attorneys asked their respective questions, the trial court asked defense counsel if he wanted individual voir dire examination of those veniremembers who claimed to be opposed to the death penalty, and defense counsel said that he did not. In addition, the trial court offered to submit those veniremembers who said they had been exposed to publicity to individual voir dire, at defense counsel's specification, after the court asked if any could not completely ignore the publicity and base the verdict solely on the evidence. The court, before asking the question, stated to defense counsel, "If you want individual voir dire after I ask this next question let me know as to which ones." No veniremember responded to the court's question, and defense counsel did not ask for individual voir dire of any member. Then, the court asked defense counsel, "[Y]ou're satisfied with everything else now?" Defense counsel responded affirmatively, but noted that he wanted the opportunity to rehabilitate those veniremembers who had expressed opposition to the death penalty. Thereafter the trial court allowed individual voir dire of those venirepersons who expressed such opposition, those who had stated that the prosecution's burden of proof should be higher in a death penalty prosecution than in any other type of prosecution, and those who had expressed a lack of belief in the plea of not guilty by reason of mental disease or defect. There is no indication that the questioning or the veniremembers answers were inhibited or confined in any manner.
Under the circumstances here, it was not plain error for the trial court to fail to conduct more extensive voir dire.
 " 'In Alabama, there is no requirement that a defendant be allowed to question each prospective juror individually during voir dire examination. This rule applies to capital cases, and the granting of a request for individual voir dire is discretionary with the trial court.' Coral v. State, 628 So.2d 954, 968 (Ala.Cr.App. 1992). 'The fact that the appellant's case involved capital murder is not alone reason to require individual voir dire. . . . A trial court's decision in denying individual voir dire examination of a jury panel will not be disturbed on appeal absent an abuse of that discretion.' Smith v. State, 588 So.2d 561, 579 (Ala.Cr.App. 1991). See also Henderson v. State, 583 So.2d 276, 283 (Ala.Cr.App. 1990), affirmed, 583 So.2d 305
(Ala. 1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992)."
Taylor v. State, 666 So.2d 36, 66 (Ala.Cr.App.), after remand, 666 So.2d 71 (Ala.Cr.App. 1994), aff'd, 666 So.2d 73
(Ala. 1995), cert. denied, Taylor v. Alabama, ___ U.S. ___,116 S.Ct. 928, 133 L.Ed.2d 856 (1996). See also Grimsley v. State,678 So.2d 1197 (Ala.Cr.App. 1996); Weaver v. State,678 So.2d 260 (Ala.Cr.App. 1995), rev'd on other grounds, Ex parteWeaver, 678 So.2d 284 (Ala. 1996).
We do not agree with Ivery's assertion that "the mass voir dire prevented adequate inquiry into a number of sensitive topics *Page 513 
including prospective jurors' exposure to inflammatory pretrial publicity, their views on the insanity defense and their beliefs regarding capital punishment." Foremost, as noted, the record gives no indication that the questioning was inhibited or confined in any manner. While the prosecution submitted written proposed questions to the court, defense counsel failed to do so. Moreover, after a short qualification by the trial court, the respective attorneys were allowed to question the veniremembers. Defense counsel had the opportunity to question the veniremembers on any legitimate subject. As noted, the trial court allowed individual voir dire of those veniremembers who had responded to the voir dire questions pertaining to the insanity defense and the death penalty. In regard to any further inquiry into the veniremembers' exposure to pretrial publicity, this case is controlled by Brown v. State,632 So.2d 14 (Ala. 1992). There, the trial court questioned the entire jury venire as a whole regarding whether pretrial publicity had affected any veniremember's ability to be impartial. In holding that the trial court's inquiry was sufficient to enable the trial court to make a meaningful determination as to whether the veniremembers could be impartial, the Alabama Supreme Court stated:
 "The method of determining impartiality is not critical. The crucial requirement is that the trial court get enough information to make a meaningful determination of juror impartiality. As the Court in Mu'Min [v. Virginia, 500 U.S. 415, 111 S.Ct. 1899, 114 L.Ed.2d 493 (1991),] stated:
 " 'Whether a trial court decides to put questions about the content of publicity to a potential juror or not, it must make the same decision at the end of the questioning: is this juror to be believed when he says he has not formed an opinion about the case?'
"500 U.S. at 425, 111 S.Ct. at 1905." 632 So.2d at 17.See also Parker v. State, 587 So.2d 1072, 1078 (Ala.Cr.App. 1991) ("under the circumstances of this case, the trial judge did not abuse her discretion in either refusing to permit unlimited individual voir dire of each member of the jury venire or in refusing to permit defense counsel to question the venire members about the specific content of the media reports to which they had been exposed") (emphasis in original).
We find no error in this regard, much less plain error.
 VI.
Ivery contends that the trial court erred in denying his motion for a change of venue.
Foremost, as the attorney general notes, the motion was not made "on oath," as required by Rule 10.1(c), Ala. R. Crim. P.See Callahan v. State, 557 So.2d 1292, 1306 (Ala.Cr.App.), aff'd, Ex parte Callahan, 557 So.2d 1311 (Ala. 1989), cert. denied, Callahan v. Alabama, 498 U.S. 881, 111 S.Ct. 216,112 L.Ed.2d 176 (1990). Moreover, Ivery expressly withdrew the motion. (R. 379.) Finally, the record offers no evidence that pretrial publicity so saturated the community as to have made the trial a "hollow formality" or that there was actual prejudice based on the veniremembers' responses during voir dire examination. See Oryang v. State, 642 So.2d 989
(Ala.Cr.App. 1994). See also George (where, in addressing the capital murder appellant's contention that the trial court erred in refusing to grant his motion for a change of venue, the court observed that the record contained no evidence to support the motion or any indication that the motion had been ruled upon, and the court disposed of the appellant's issue by finding that "there is no evidence in the record from which this court can determine whether the appellant met his burden in showing that the venire was prejudiced by pretrial publicity"). Although a substantial number of the venire indicated that they had heard something about this case through the media, all those responding also indicated, upon further questioning, that they could ignore the publicity completely and base their verdict solely on the evidence.
 "The defendant is not entitled to jurors who are totally ignorant of the facts and issues involved in the case or to jurors who never entertained a preconceived notion as to the defendant's guilt or innocence. Ex parte Grayson, 479 So.2d 76, 80
(Ala.), cert. denied, 474 U.S. 865, 88 L.Ed.2d 157, 106 S.Ct. 189 (1985). A defendant is entitled *Page 514 
to a trial by jurors who can lay aside any preconceived impressions or opinions and render a verdict based on the evidence which is presented at trial, id. The record in this case indicates that the appellant received such a trial."
642 So.2d at 993.
 VII.
Ivery contends that the trial court's failure to question the potential jurors on their bias in favor of the death penalty resulted in his being convicted and sentenced in a constitutionally defective manner.
At no time did defense counsel ask that the trial court question the veniremembers on any pro-death penalty bias. As noted, while the prosecution submitted written proposed questions, defense counsel failed to do so. Moreover, after a short qualification by the trial court, the respective attorneys were allowed to question the veniremembers. Defense counsel had the opportunity to question the veniremembers on this subject but failed to do so.
We find no plain error.
 "The failure of the trial court to propound sua sponte 'reverse-Witherspoon' questions to the jury venire and the failure of the court to 'life-qualify' the jury does not constitute plain error. Henderson v. State, 583 So.2d 276, 283-84
(Ala.Cr.App. 1990), affirmed, 583 So.2d 305 (Ala. 1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268
[117 L.Ed.2d 496] (1992). 'The burden of either asking or having the trial judge ask a "reverse-Witherspoon" question lies with the appellant.' Smith v. State, 581 So.2d 497, 506
(Ala.Cr.App. 1990), reversed on other grounds, 581 So.2d 531 (Ala. 1991). Here, as in Smith, 581 So.2d at 506, 'we have reviewed the appellant's claim, and we find no "plain error" by the trial judge's failure to ask sua sponte a "reverse-Witherspoon" question.' "
Taylor, 666 So.2d at 66-67 (footnote omitted). See also Haneyv. State, 603 So.2d 368, 391-92 (Ala.Cr.App. 1991), aff'd,603 So.2d 412 (Ala. 1992), cert. denied, Haney v. Alabama,507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993); Dill v.State, 600 So.2d 343, 363 (Ala.Cr.App. 1991), aff'd,600 So.2d 372 (Ala. 1992), cert. denied, 507 U.S. 924,113 S.Ct. 1293, 122 L.Ed.2d 684 (1993); Kuenzel v. State, 577 So.2d 474,484-85 (Ala.Cr.App. 1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, Kuenzel v. Alabama, 502 U.S. 886, 112 S.Ct. 242,116 L.Ed.2d 197 (1991).
 VIII.
Ivery contends that the trial court's alleged exercise of a peremptory challenge to remove veniremember no. 2 from the jury venire violated his constitutional rights as well as Alabama statutes.
After the trial court disposed of the parties' challenges for cause and granted excusals, the following occurred:
 "THE COURT: . . . . That leaves 41 jurors. Do y'all want to reduce it to 40?
"[PROSECUTOR]: That's fine with me, yes, sir.
"[DEFENSE COUNSEL]: Yes, sir, Judge.
 "THE COURT: Let's see. Jo, should I strike an even number or an odd number juror to make it even?
"JO SCHWARZAUER: Even.
"THE COURT: All right. Strike number two."
Defense counsel made no objection to the trial court's action and also failed to respond to the court's request, "[I]f you have any questions about the [veniremembers] being excused let me know before they get out of this room."
Defense counsel consented to the removal of a veniremember and is now estopped to complain. Cf. Duncan v. State,587 So.2d 1260, 1263 (Ala.Cr.App. 1991). Furthermore, we agree with the attorney general that the trial court's action is not properly characterized as an exercise of a peremptory challenge. Rather, the trial court's action was authorized by Rule 18.4(f)(1), which states, in pertinent part, the following:
 "After voir dire examination of the prospective jurors has been completed and challenges for cause have been exercised, the court shall cause to be compiled a list of names of prospective jurors who are competent to try the defendant, from *Page 515 
which list the jury shall be obtained. If, in compiling the list, names of qualified prospective jurors are omitted, such omissions shall be made on a nondiscriminatory basis."
(Emphasis added.)
 IX.
The trial court's jury instructions during the sentencing phase included the following statement:
 "In other words, the law contemplates that different circumstances may be given different weights or values in determining a sentence in a case and you, as a jury, are to decide what weight or value is to be given to a particular circumstance in determining the sentence in light of all the other circumstances in this case. You must do that in the process of weighing the aggravating and mitigating circumstances in this case."
(Emphasis added.) In his brief to this court, Ivery contends that this statement violated the rule in Mills v. Maryland,486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988) (holding that due process is violated "[i]f there is a substantial possibility that reasonable jurors, upon receiving the judge's instructions. . . ., well might have thought they were precluded from considering any mitigating circumstances unless all 12 jurors agreed on the existence of a particular such circumstance" (emphasis added)). No objection was made at trial to this instruction; therefore, we consider this issue under the plain error standard.
Ivery's appellate argument is specious. Mills does not apply to this jury instruction. The holding in Mills provides that even if only one juror believes that a certain mitigating circumstance exists, then that juror may properly consider that circumstance in determining whether the sentence of death is appropriate. Unlike Mills, the jury charge in this case is limited to the question of a mitigating circumstance's weight — not its existence.[6] It is axiomatic that, during deliberations on the question of whether a defendant should be sentenced to death, the jury should be encouraged to discuss the applicable aggravating and mitigating circumstances and the weight to be accorded each. See, e.g., Whisenhant, 482 So.2d at 1234 (approving the trial court's penalty phase jury instructions, that "the law contemplates that different circumstances may be given different weights or values in determining the sentence in a case and you, the jury, are to decide what weight or value in determining sentence is to be given to a particular circumstance in light of all the circumstances that you have heard in this case") (emphasis added.). See also Taylor, Kuenzel, 577 So.2d at 521
(Ala.Cr.App. 1990) (rejecting, under Mills, the appellant's contention that " 'it would be perfectly reasonable for a juror to conclude . . . . that "you" means all of you, unanimously, when determining whether a mitigating circumstance existed' " (emphasis in original)). We find no plain error here.
 X.
Ivery contends that photographs of the victim's body were erroneously admitted into evidence, because, he argues, they were "gruesome, cumulative and served no purpose other than to prejudice Mr. Ivery." (quoting the appellant's brief at 55). These photographs are included with the record, and consist of several 8" by 12" color photographs depicting the victim's body and head at the crime scene and at what appears to be the morgue. One photograph shows the victim's headless body and her head lying in a pool of blood on the floor of the convenience store where she was murdered. Another photograph, a close-up of the same scene, illustrates the wound that severed the victim's head. Another shows the victim's scalp, shaved to expose several cranial wounds, which testimony indicated were inflicted by a heavy blunt instrument. Another photograph illustrates injuries inflicted to the victim's face. Ivery's counsel raised no objection to the admission of these photographs at trial. Accordingly, we review this issue under the plain error doctrine. The failure of Ivery's counsel to raise this issue at *Page 516 
the trial level weighs against any finding of prejudice.Dill.
 "As a general rule, photographs are admissible in evidence if they tend to 'prove some disputed or material issue or elucidate some other relevant fact or evidence, to corroborate or disprove some other evidence offered or to be offered,' and their admission is within the sound discretion of the trial judge. Fletcher v. State, 291 Ala. 67, 277 So.2d 882 (1973); Thigpen v. State, 50 Ala. App. 176, 277 So.2d 922 (1973); Hopkins v. State, 429 So.2d 1146 (Ala.Cr.App. 1983). Photographs may be admitted if they tend to shed light on, strengthen, or to illustrate other testimony in the case. Chunn v. State, 339 So.2d 1100 (Ala.Cr.App. 1976); Thornton v. State, 369 So.2d 63
(Ala.Cr.App. 1979). In addition, photographs are admissible even though they may be cumulative, demonstrative of undisputed facts, or gruesome. Craft v. State, 402 So.2d 1135 (Ala.Cr.App. 1981); McKee v. State, 33 Ala. App. 171, 31 So.2d 656 (1947); Godbolt v. State, 429 So.2d 1131 (Ala.Cr.App. 1982)."
Arthur v. State, 472 So.2d 650, 660 (Ala.Cr.App. 1984), rev'd on other grounds, Ex parte Arthur, 472 So.2d 665 (Ala. 1985). We have examined the photographs specified above and others which were comparatively less gruesome, and find that their admission into evidence was not plain error.
 XI.
Ivery contends that the following comment made by the prosecutor in his closing argument in the guilt phase was an impermissible comment on Ivery's failure to testify:
 "The Judge will charge you that intent is a mental operation which must be inferred from circumstances. Because no one, not even a psychologist or a psychiatrist, can look into the mind of another human being."
We agree with Ivery that "[i]t is a basic principle of law that once a defendant chooses not to testify at his trial the exercise of that choice is not subject to comment by the prosecution," Wherry v. State, 402 So.2d 1130, 1133
(Ala.Cr.App. 1981), and that this principle must be observed "with the strictest of scrutiny," id. However, we find that the comment under scrutiny does not fall in that forbidden area.
The comment here is sufficiently akin to the one reviewed and permitted in Ex parte Windsor, 683 So.2d 1021 (Ala. 1994), thatWindsor controls here, and we quote at length from that opinion:
 "During closing argument, the following exchange occurred:
 " '[Prosecution]: An intentional act — [the Judge] will tell you a person acts intentionally if his purpose is to cause that result or to engage in that conduct. That intent, whether Mr. Harvey Lee Windsor pulled the trigger of that sawed-off shotgun or whether Colon Lavon Guthrie did it, is still there. The intent to kill. Intent is a state of mind — something that is rarely capable of positive proof. I expect the Judge will tell you that. If we could get into that mind over there and put out here what is in there, we would have no reason for a jury.
 " '[Defense counsel]: Object, that is improper argument.
" '[The Court]: Overruled.
 " '[Prosecution]: I'll tell you that he did have the intent to kill. If you find the intent to kill, there can be but one verdict. The state of mind — not capable of positive proof. How can you decide what his intent was? We have to prove — to find him guilty of capital murder — the intent. Intent can be inferred from his actions. Judge Austin will tell you in his charge that the intent can be inferred from his actions. Let's look at his actions. What did he do? How do we decide his intent? What are his actions?'
 "As this Court recently held in Ex parte Musgrove, 638 So.2d 1360 (Ala. 1993), 'When an accused contends that a prosecutor has made improper comments during a closing argument, the statements at issue must be viewed in the context of the evidence presented in the case and the entire closing arguments made to the jury. . . .' *Page 517 
638 So.2d at 1368 (citing Washington v. State, 259 Ala. 104, 65 So.2d 704 (1953); Stephens v. State, 580 So.2d 11 (Ala.Crim.App. 1990), aff'd, 580 So.2d 26 (Ala. 1991), cert. denied, [502 U.S. 859] 112 S.Ct. 176 [116 L.Ed.2d 138] (1991)). In this case, the prosecutor was explaining the difference between felony murder and capital murder, and arguing that the State had proven Windsor guilty of capital murder. In order to do so, the State had to prove Windsor's intent to kill.
 "In this narrow context, it is apparent that the prosecutor was referring not to Windsor's failure to testify, but rather to the State's own failure to produce direct evidence of Windsor's intent. The only way for the State to prove intent, and, therefore, to obtain a conviction on the capital murder charge, was to show that Windsor acted in accordance with an intent to kill. In a certain sense, what the prosecutor said was true. To mangle the maxim, it could be said that were we able to peer into the hearts of men, there would be no question of fact to be resolved by the jury concerning the specific issue of the defendant's state of mind at the time of the offense. However, resolution of that specific issue is certainly not the full extent of the jury's function, and even indirect comments on an accused's failure to testify have the potential to be highly prejudicial to the defense. Musgrove, supra.
 "Alabama, by statute, specifically protects the privilege against self-incrimination from comment by the prosecution. § 12-21-220, Ala. Code 1975. A prosecutor must be extremely careful not to overstep the mark or to break with the established protocol regarding statements about that privilege. Musgrove, supra. To improperly comment on that privilege would be a clear violation of the defendant's rights under Article I, § 6, Ala. Const. 1901, as well as the rights protected by the Fifth Amendment as that Amendment is incorporated into the Fourteenth Amendment to the United States Constitution.
 "In Ex parte Wilson, 571 So.2d 1251, 1261 (Ala. 1990), this Court cited the standard endorsed by the United States Court of Appeals for the Eleventh Circuit:
 " ' "[A] statement by a prosecutor is improper if it was manifestly intended to be, or was of such a character that the jury would naturally and necessarily take it to be, a comment on the failure of the accused to testify." Marsden v. Moore, 847 F.2d 1536, 1547 (11th Cir.), cert. denied, 488 U.S. 983, 109 S.Ct. 534, 102 L.Ed.2d 566 (1988); United States v. Betancourt, 734 F.2d 750, 758 (11th Cir.), cert. denied, 469 U.S. 1021, 105 S.Ct. 440, 83 L.Ed.2d 365 (1984).'
 "We cannot say that the statement made in this case was intended to be a remark on Windsor's failure to testify; nor can we conclude that the natural and necessary reaction of the jury would be to conclude that the prosecutor was referring to Windsor's failure to take the stand in his own defense. We hold that the trial court properly overruled the objection to the prosecutor's statement."
683 So.2d at 1023-24. In our application of Windsor, we note that we consider the comment here to be even less arguably objectionable than the Windsor comment, and that, in addition, the review here is under the plain error standard.
We do not agree with Ivery that the comment here is as egregious as the one condemned in Witherspoon v. State,596 So.2d 617 (Ala.Cr.App. 1991) (as he pointed to the defendant, the prosecutor stated, "I submit to you, members of the jury, the only person that knows what was going on in Anthony Witherspoon's head is that man sitting right there"). See alsoWoods v. State, 641 So.2d 316, 318-20 (Ala.Cr.App. 1993), cert. denied, Woods v. Alabama, ___ U.S. ___, 115 S.Ct. 331,130 L.Ed.2d 290 (1994) (no error was committed by the prosecutor in his discussion of the law of intent because he did not specifically refer to the defendant).
 XII.
Ivery contends that the trial court erred by admitting the videotape of the circumstances surrounding the crime into evidence, because, he argues, the videotape depicted an incomplete account of the crime. Generally, videotapes are governed by the *Page 518 
same rules of evidence as still photographs, and their admissibility is a matter addressed to the sound discretion of the trial court. McFarland v. State, 581 So.2d 1249
(Ala.Cr.App. 1991).
The videotape in this case was recorded in the course of the convenience store's routine security surveillance. Two video cameras were directed at the counter in the area of the cash register. The cameras were positioned on opposite sides of the cash register so that if the cashier stood at the drawer of the cash register, one camera was on the cashier's right and the other on the left. The cameras' fields of vision did not extend to the floor, and events occurring on or near the floor are not depicted on the videotape. The cameras recorded black and white still images in one second intervals, which were recorded by a single video recorder locked in a room in the back of the store. The resulting videotape depicts a succession of images that alternate between a left-view and a right-view. The time and date of each image is displayed at the top of the screen, and there is no audio on the tape. Charlotte McCarn, the victim's former supervisor, monitored the videotape on the day of the murder and testified that it accurately depicted the scene.
On the day of the murder, the videotape shows Ivery loitering in the convenience store as several customers come and go and the cashier conducts her business. Eventually, Ivery and the victim are alone and they lock the doors. The victim then opens the cash register, and Ivery removes the money from the drawer. Ivery opens his satchel, which is on the counter beside the cash register, and the victim gets onto the floor. Ivery removes a roll of duct tape and then ducks below the field of vision of both cameras. Several succeeding frames do not depict Ivery or the victim. These frames are interspersed with images of Ivery fishing through his satchel, returning to the floor, and wiping his hands and arms with a paper towel. One frame shows what the prosecution argues to be the blurred image of Ivery's hatchet. After this portion of the video tape, the victim is not seen again. Ivery gathers his belongings, puts his satchel over his shoulder, and unlocks the door. Before leaving, Ivery returns to the edge of the counter and peers down at the floor in the area where the victim's body was later found. Between Ivery's departure and the arrival of the police, approximately 25 minutes, the tape shows no one else in the convenience store. Ivery's expert witnesses testified to numerous statements that Ivery made to these witnesses that corroborated the events as portrayed on the videotape.
The gravamen of Ivery's argument appears to be that the tape should be inadmissible, because, he says, the manner in which the video tape was made left unrecorded gaps between the images. This court rejected this argument in Robinson v. State,621 So.2d 389 (Ala.Cr.App. 1993). The holding in Robinson
indicates that as long as a videotape fulfills the traditional requirements of admissibility, the fact that certain events may be undocumented by the videotape will not bar its admission into evidence.[7] The testimony convinces us that the videotape is accurate and was properly admissible under the "pictorial communication" theory. See Molina v. State, 533 So.2d 701
(Ala.Cr.App. 1988), cert. denied, Molina v. Alabama, 489 U.S. 1086,109 S.Ct. 1547, 103 L.Ed.2d 851 (1989). Moreover, although we base our holding on the "pictorial communication" theory,Robinson indicates that this videotape would also be properly admissible under the "silent witness" theory.
Furthermore, we hold here that the videotape's probative value outweighed any conceivable prejudice. See, e.g.,United States v. Weisz, 718 F.2d 413 (D.C. Cir. 1983), cert. denied,Weisz v. United States, 465 U.S. 1027, 104 S.Ct. 1285,79 L.Ed.2d 688 (1984) (videotape depicting Congressman Richard Kelly "stuffing" a $25,000 bribe into his pockets held not unduly prejudicial); United States v. Guerrero, 667 F.2d 862
(10th Cir. 1981), cert. denied, Guerrero v. United States,456 U.S. 964, 102 S.Ct. 2044, 72 L.Ed.2d 490 (1982) *Page 519 
(videotape depicting defendant, charged with assault, hurling two eggs at Presidential candidate John Anderson and striking him with at least one held not unduly prejudicial). The videotape here is without question prejudicial; however, "while such direct evidence of a crime is certainly prejudicial to a defendant's case, without more, it is not unfairly so." Weisz, 718 F.2d at 432.
 "In a criminal prosecution much of the evidence is prejudicial to the defendant but that does not rule it out if it is competent as well, as this evidence was when you can gainsay the value of a motion picture, the commission of the crime. Indeed, this is the answer to a prosecutor's dream, to have such evidence as this."
Guerrero, 667 F.2d at 867. Ivery was not unduly prejudiced by the admission of the videotape, and its admission into evidence was not plain error.
 XIII.
Ivery contends that the warrantless search that resulted in the recovery of the satchel, the hatchet, the hammer, the knife, the duct tape, and the cash was an unconstitutional invasion of his privacy. Therefore, he argues, the evidence obtained as a result of that search should not have been admitted. In the absence of any objection to this evidence at trial, we review this issue under the plain error standard.
Following Ivery's arrest, the police began a systematic, 11-day sweep of the area around the crime scene, searching abandoned houses for the weapons used in the murder. These warrantless searches involved approximately 75 police officers and 200 abandoned houses. The sweep concluded with the search of the house at 1161 Martin Luther King, Jr. Drive, where the evidence was discovered.
Rosalyn Elizabeth Howard Dean testified at trial that she was the owner of this house when it was searched. At that time, Dean had never seen Ivery and had never given him permission to enter the property. Officer James A. Mayo testified that when the police arrived to conduct the search, there was no lock on the front door, no electricity, no gas, and no running water. The front door was ajar, and several windows were broken. The back door was also unsecured. Officer Mayo testified that the property had not been secured in any way. He further testified that he discerned no attempt to do so. In one room of the house, Mayo observed a makeshift bed, some personal clothing, a neat pile of garbage, an upside-down bucket that had a candle sitting on it, food supplies, and other items. Mayo testified that the area was "very neat, very clean, and orderly." A closet door was open, and Mayo observed Ivery's satchel on the floor of the closet. Mayo recognized the satchel from the videotape, which he had previously viewed. He opened the satchel, discovered the weapons, and seized the bag and its contents as evidence.
Our consideration of this issue is controlled by Morris v.State, 521 So.2d 1364 (Ala.Cr.App. 1987), which presents several factors to be weighed in determining whether a "squatter" has a sufficient privacy interest in the premises searched to implicate the Fourth Amendment. The appellant inMorris was held not to have had a reasonable expectation in the privacy of the premises searched, and the facts in this case are substantially similar to the facts in Morris. Therefore, it appears that Ivery has failed to show that the search was illegal.
However, we need not decide the legality of the search issue in this case. Ivery's defense conceded that he committed the act in the manner alleged by the prosecution. For example, Dr. Koch testified that in the course of his evaluation of Ivery, the following occurred:
 "[Ivery told me he] waited for the people [in the store to leave] then taped the victim's hands, mouth, eyes, and legs with duct tape. He told me he then struck her with a sledgehammer and told me that it really felt good when he heard her head crack and he smiled with pleasure relating this. He told me he then cut her head off with a hatchet, forgetting that he had been told earlier by God to use only a knife. He explained that cutting a head off with a knife is not as difficult as I suggested that it might be or I inquired about it. He explained how one saws through the *Page 520 
chord — the spinal chord with steady pressure and motion."
The question of whether Ivery intentionally killed the victim was not in dispute, nor was the manner in which he killed her. A videotape of the circumstances of the crime was properly admitted into evidence. That tape portrays the satchel, the duct tape, and an empty scabbard. Furthermore, Ivery's failure to object to the admission of the evidence seized in the search of the house weighs against any alleged prejudice.Dill. In light of these facts, we do not believe that effect of this evidence at trial was unduly prejudicial, and can find no plain error.
 XIV.
Ivery contends that the automatic finding of the aggravating circumstance that the capital offense was committed while Ivery was engaged in the commission of a robbery, § 13A-5-49(4), violated his constitutional rights because robbery was an element of the capital offense for which he was convicted. This issue of "double-counting" or "over-lapping" has been decided adversely to Ivery's position. See Windsor v. State,683 So.2d 1027 (Ala.Cr.App. 1994); Burton v. State, 651 So.2d 641,657-58 (Ala.Cr.App. 1993), aff'd, 651 So.2d 659 (Ala. 1994), cert. denied, Burton v. Alabama, ___ U.S. ___, 115 S.Ct. 1973,131 L.Ed.2d 862 (1995); Kuenzel, 577 So.2d at 486-88.
Accordingly, we affirm Ivery's capital murder conviction. However, in accordance with, Part II.B. of this opinion, we remand the case to the trial court and instruct it to enter specific findings regarding the existence or nonexistence of any nonstatutory mitigating circumstances that it may have considered in sentencing Ivery to death. Due return shall be made to this court within 28 days.
AFFIRMED AS TO CONVICTION; REMANDED WITH INSTRUCTIONS AS TO SENTENCING.
All Judges concur.
[1] Dr. Barnard subsequently defined "malingering," in this context, as the "faking of signs of a mental illness for a secondary purpose and it can be to obtain money or it can be to obtain employment or it can be to get out of being criminally responsible for one's acts." (R. 583).
[2] The present statute amended Alabama's former insanity statute, making two significant changes. First, it eliminated the volitional alternative of the insanity defense. Second, it amended the approach to the cognitive alternative: the previous cognitive formulation required that the defendant could not appreciate the "criminality" of his or her acts; the present approach requires that the defendant could not appreciate the "wrongfulness" of his or her acts. See, generally, Ware v.State, 584 So.2d 939, 942 (Ala.Cr.App. 1991) (discussing this statute as it relates to "significant change[s] in the insanity defenses previously available in criminal trials.").
[3] One of Ivery's expert witnesses, Dr. Brown, narrowed the issue to "appreciation" through use of an automobile analogy. He explained that both a child and an adult know what an automobile does, but their knowledge is in different degrees — the adult better appreciates the functions of an automobile than does the child.
[4] We read this comment to be a reference to the victim's race — not to Ivery's, although Ivery is also black. Cf., Wilder v.State, 401 So.2d 151 (Ala.Cr.App.), cert. denied, Ex parteWilder, 401 So.2d 167 (Ala.), cert. denied, Wilder v. Alabama,454 U.S. 1057, 102 S.Ct. 606, 70 L.Ed.2d 595 (1981) (affirming the trial court in a case where the prosecutor's allegedly racially inflammatory remarks were not directed at the defendant).
Our interpretation is consistent with that presented by Ivery in his brief to this court.
[5] We note that Ivery's entire defense was based upon his claim that he believed that he was "the ninja of God," and that he allegedly committed the offense only as a result of a delusionary deific command. We find it difficult to understand his claim of prejudice on this issue, where, elsewhere in his brief to this court, Ivery asserts that the jury should have been instructed to evaluate his ability to appreciate the moral
wrongfulness of his acts.
[6] Elsewhere in the course of penalty-phase jury instructions, the trial court properly charged the jury regarding its duty in determining the existence of mitigating circumstances.
[7] The logical caveat to this rule is that if the gaps in the tape's reflection of the events are so severe that the tape appears to be inaccurate, then it would be inadmissible. However, this does not appear to be the case with this videotape.